**Ana Maria HENGAN, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 95–2939.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1996.

Decided March 20, 1996.

Richard B. Kapnick, James B. Speta (argued), Sidley & Austin, Chicago, IL, for Petitioner.

Anthony W. Norwood (argued), Department of Justice, Office of Immigration Litigation, Washington, DC, Samuel Der-Yeghiayan, Immigration & Naturalization Service, Chicago, IL, David M. McConnell, Stephen W. Funk, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before COFFEY, EASTERBROOK, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Ana Maria Hengan was born in Romania, but her ancestry is Hungarian. During the dictatorship of Nicolae Ceausescu, Romania pursued a policy of assimilating minority groups. This policy ended with Ceausescu's government, and today Romania has many political parties and factions based on ethnicity. There is a corresponding anti-minority movement, the Party of Romanian National Unity (Vatra Romaneasca), which favors excluding ethnic minorities from the nation's civic and economic life.

Approximately 11 percent of Romania's population of 23 million is of Hungarian ancestry. Most live in Transylvania, which Romania annexed in 1919, after the Austro–Hungarian empire collapsed. Friction between the Hungarian minority and the 78 percent of the population who consider themselves "native" Romanians has persisted.

The government that replaced the communist regime includes some of the nativist factions; Hungarians have been in the opposition. Hengan lived near Cluj, whose mayor, Gheorghe Funar, is a vigorous supporter of the Vatra Romaneasca. Funar outlawed bilingual signs, tried to evict Hungarian organizations from their offices, and whipped up anti-Hungarian sentiment. The State Department's 1993 country report for Romania relates that the central government has been unable to stop Funar's harassment of Hungarians.

Official support for intolerance has private consequences. Hengan, who joined the Hungarian Democratic Union (UDMR) soon after its organization in 1990, became a party leader in her factory and suffered for it. (We recount the facts as Hengan recites them; the immigration judge credited her story.) When she would not give up party work, she was demoted and harassed by the local police. Threatening mail and telephone calls arrived. Someone broke a window of her house and threw in a dead rat with a note stating: "You are next! All Hungarians should be hanged! No Hungarian memorials in our country! Do you understand it?" Slogans appeared on her fence with threats such as: "Hungarians should be hanged, and if you do not stop your activities, we will break your bones." The local police and the Romanian Secret Service not only did nothing to protect her but also began to summon Hengan for weekly questioning—not about who may have been threatening her, but about whom she worked with in the UDMR. In 1991 the UDMR organized a celebration that was broken up by the Vatra Romaneasca, accompanied by members of the Romanian Secret Service (out of uniform, and in their "private capacities"). The attackers beat the Hungarians with sticks; and although Hengan escaped without injury, many other people were hospitalized. Hengan began planning to escape the country. She journeyed to the United States as a tourist, and, shortly after arriving, filed an application for asylum. Her application was supported not only by her own account, but also by an affidavit of a co-worker who has been granted asylum in Germany. And her tale is consistent with the reports of the State Department and

international human rights groups, which verified the mistreatment of ethnic Hungarians in Romania during the early 1990s.

An advisory opinion filed in the asylum proceedings by the State Department's Bureau of Human Rights and Humanitarian Affairs, see 8 C.F.R. § 208.11, reports that the Department lacks information about Hengan or her circumstances. The Bureau then made some general observations about the difficult process of establishing tolerance and democracy in Romania. It reported that the UDMR is an active political party that supports democratic reform. The party "occasionally offends the Romanian majority, including the opposition, by pressing strongly on minority issues and calling for collective ethnic rights." But because the UDMR received 7 percent of the vote in the 1992 national elections, the Bureau concluded that it had "difficulty in finding a basis in [Hengan's] account for a plausible concern over mistreatment on her return to Romania." The immigration judge then denied Hengan's application for asylum, writing that the record "does not reveal a level of mistreatment that can be characterized as 'past persecution' by the Romanian government on account of her Hungarian ancestry" sufficient to justify asylum. To support that conclusion, the immigration judge offered five observations:

(1) The respondent was able to obtain post-graduate education and maintain continuous employment from 1973 to 1992.

(2) The respondent was never arrested or charged with any offense, political or otherwise.

(3) The respondent was not subjected to any form of physical abuse by the Romanian authorities.

(4) The respondent was issued a passport and allowed to depart the country without apparent difficulty.

(5) Although the record contains evidence that Hungarians in Romania had been victimized by discrimination and in some cases "forced assimilation", the record herein does not reveal that the respondent suffered these forms of mistreatment to

the extent that it can be concluded that she was subjected to "past persecution".

The Board of Immigration Appeals affirmed on the basis of the immigration judge's opinion.

The State Department's generally optimistic assessment of conditions in Romania, coupled with the deference due to the Department of Justice in the administration of the immigration laws, see *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); *Mitev v. INS*, 67 F.3d 1325, 1329–30 (7th Cir.1995), may well support a denial of Hengan's application. Many parts of the globe have ethnic conflict, even civil war, but the immigration laws do not offer asylum to all who become embroiled in such strife. See *Bevc v. INS*, 47 F.3d 907 (7th Cir.1995); *Milosevic v. INS*, 18 F.3d 366 (7th Cir.1994); *Sivaainkaran v. INS*, 972 F.2d 161 (7th Cir.1992); *Zulbeari v. INS*, 963 F.2d 999 (7th Cir.1992). Persecution differs considerably in degree and effect; the Immigration and Naturalization Service is entitled to restrict asylum to those who have suffered the most, or are at greatest risk in the future. Hengan has been through unpleasant experiences, but when she left Romania she was employed and uninjured. The State Department's country report for 1994, issued in February 1995, states that Romania does not persecute any part of the population on account of ancestry, religion, and similar attributes. According to the 1994 report, the UDMR has 28 seats in Parliament's Chamber of Deputies and 12 seats in the Senate. It functions as a normal political party, without persecution at the national level. The report continues:

> As in all years since the 1990 Tirgu Mures riots, 1994 witnessed no violence associated with ethnic Hungarian issues, despite several potentially incendiary incidents, such as the archaeological excavation in Cluj, plans to erect statues of World War II dictator Antonescu in Transylvania, and a highly controversial education bill.

The report for 1995, issued earlier this month, concurs:

> There was no violence in 1995 associated with ethnic Hungarian problems despite extremist rhetoric from the Party of Ro-

manian National Unity, the resumption of archaeological excavations near the statue of Hungarian King Mateus Corvinus in Cluj, and other provocative acts by nationalist extremists.

> A highly controversial Law on Education was adopted in June. Although the law was deemed by the OSCE High Commissioner for National Minorities to be in line with European and international standards, it rescinds the rights of Hungarians to take university entrance examinations in Hungarian for those subjects not taught in Hungarian. It also dictates that certain vocational schools use only Romanian, which some Hungarians charge will disadvantage Hungarian ethnic citizens who work in these areas. However, implementation of the law has been postponed until 1997, and the Government has accepted OSCE review of the implementation process.

■ Although the State Department is sanguine, we think that the record *could* support a grant of asylum under the standards of 8 U.S.C. § 1158(a). Hengan does not argue that the national government of Romania persecutes Hungarians; instead she contends that the national government is unwilling or unable to control local persecutors, such as Mayor Funar, his police, and his supporters. "Unwilling" because the national government depends on the Vatra Romaneasca and its sympathizers for support. Vigorous intervention would dissolve the governing coalition, Hengan believes. "Unable" because it is difficult for even the most determined national government to stop local officials from harassing or harming members of other ethnic groups (or giving shelter to private persons who do so)—as the experience of the United States with the Ku Klux Klan demonstrates. The State Department's view that there has been no violence against Hungarians "since the 1990 Tirgu Mures riots" is inconsistent with Hengan's account of the 1991 UDMR celebration, an account the immigration judge credited. That divergence might lead immigration officials to give greater weight to the views of Helsinki Watch and other human-rights organizations, which have decidedly darker estimates of

how Hungarians fare in Romania. Hengan has been a leader among ethnic Hungarians, and, if Helsinki Watch is right, her fears are justified. Hengan's fears are more than concerns about Hungarians in general: the dead rat, the painted threats, the letters, the phone calls in the night, the demotion at work (Hengan's superior is a member of the Vatra Romaneasca), the repeated summonses to the offices of the secret police, all were directed to her personally. Contrast *Borca v. INS*, 77 F.3d 210, 215 (7th Cir. 1996) (two visits to Romanian police, plus a few threatening phone calls, are insufficient to demonstrate persecution).

 Ordinarily the propriety of decision either way leads a reviewing court to affirm. The Department of Justice, and not the court, holds the power to exercise discretion. Yet the fact that a case is on the cusp between opposing decisions also means that the intrusion of inappropriate or irrelevant considerations can upset the balance. The immigration judge's list of "observations" contains several irrelevancies that may have affected the decision. Indeed, the judge's list leads us to fear that he misunderstood the nature of the arguments Hengan was making. For most of its citizens, Romania changed for the better in December 1989 when communism crumbled. See *Dobrican v. INS*, 77 F.3d 164 (7th Cir. 1996). But Hengan argued that for ethnic Hungarians the death of Ceausescu changed things *for the worse.* Until December 1989 the Romanian government had a policy of assimilation, under which, for example, the Hungarian language could not be taught in the schools. But ethnic Hungarians who adapted had full political and economic rights. The new democratic government, Hengan argues (with support from the State Department's 1993 country report), allows greater reign to xenophobic elements in the population, who formed political parties that dominate some local governments and supply enough support to the national government to cut off that source of protection. A Ceausescu might have had a Funar killed; the Iliescu government, by contrast, relies on Funar's supporters for its survival.

We do not know whether this is an apt description of affairs in Romania, but the immigration judge did not make any findings on the subject. Instead his observations begin by recounting how Hengan fared under the communist dictatorship. The immigration judge's first observation is that Hengan obtained an advanced education and good employment—true enough, but irrelevant to Hengan's contention. So too with the second observation: the Ceausescu regime did not arrest Hengan, but in 1991 the police harassed her weekly. The third observation—that Hengan "was not subjected to any form of physical abuse by the Romanian authorities"—misses the point of Hengan's observation about the relations between local and national authority in contemporary Romania. And the fourth observation—that Hengan was allowed to depart—does more to support Hengan than to refute her claim. She contends that many ethnic Romanians want the ethnic Hungarians gone, or dead. Until World War II began, the Nazi government of Germany allowed Jews to depart; that hardly proved lack of persecution! Then there is the fifth observation, half of which is devoted to the "assimilation" policy that ended with Ceausescu's life.

All in all, this is not a reasoned treatment of the argument Hengan made in support of asylum. The immigration judge failed to draw or even to acknowledge distinctions—between the Ceausescu and Iliescu governments, and between local and national officials—that are central to Hengan's position. The closest he came was in a brief discussion of the demotion and threats following Hengan's political activities in 1990 and 1991. The immigration judge wrote that these "highly unfortunate incidents appear to have taken place over relatively brief timespans ... or to have not been directed at [Hengan] personally (the attack of the celebrants at Santa Anna by Vatra Romaneasca during the summer of 1991)." The years 1990 and 1991 can be called "relatively brief" only by reference to a longer span that includes the Ceausescu dictatorship. Hengan left Romania a little more than two years after Ceausescu's overthrow and death, and those years were punctuated by threats and hostile interrogations, threats made credible by events such

as the armed attack on the 1991 UDMR celebration.

■ Agencies must respond to the arguments made to them and avoid decisions based on irrelevancies. *Salameda v. INS,* 70 F.3d 447, 451 (7th Cir.1995). Because we are not confident that the immigration judge and the Board of Immigration Appeals would deny asylum after discarding irrelevant considerations and paying more attention to the arguments Hengan actually made, we vacate the decision and remand for further consideration.