# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-1618

JAMES G. GRUPEE,

*Petitioner*,

v.

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

_____

Petition for Review of a Decision
of the Board of Immigration Appeals.

_____

ARGUED MARCH 2, 2005—DECIDED MARCH 16, 2005

_____


Before BAUER, EASTERBROOK, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Until he fled in 2000, James Grupee was the chief of staff to the vice president of Liberia. He sought asylum immediately on arriving in this nation, contending that he had been arrested and tortured in retaliation for using his position to provide clandestine support to human-rights endeavors. That Grupee is who he claims to be, and that he provided assistance to Liberians United for Democracy in Africa (LUDA), no one doubts. Stories in Monrovia's media corroborated the tale of his disappearance into the prison system on claims by the vice president's security chief that by helping LUDA he was

plotting the government's downfall. (Formal charges were not preferred.) The State Department's dim view of the human-rights record of the regime that ruled Liberia until August 2003 makes his claim of mistreatment in prison plausible. Yet the immigration judge thought his account of events false, and the Board of Immigration Appeals affirmed in a one-paragraph opinion.

According to the IJ, four aspects of Grupee's tale make it too tall to be true: (1) Grupee testified that he reported to work for two days between his release from prison and his departure for the Ivory Coast; the IJ thought it unlikely that a person suspected of treason would have done so. (2) Grupee obtained a passport immediately after his release; the IJ thought it unlikely that Liberia would have furnished a travel document to an enemy of the state. (3) Grupee testified that his work for LUDA led to his arrest; the IJ found it suspicious that he had not made such a claim earlier and had not produced any of the reports he wrote for LUDA's use. (4) The IJ thought it telling that only one piece of evidence (an affidavit from Grupee's brother) came from anyone who had personal knowledge of the arrest. None of the IJ's concerns amounts to substantial evidence in support of a conclusion that Grupee is not credible, and they are no stronger collectively than they are individually.

Grupee told the IJ exactly why he had returned to the vice president's office: so that he would be left alone for long enough to arrange his departure. He feared that any other step would lead the authorities to treat flight as a confession of guilt and arrest him again. He wanted to present the picture of a person secure in his own innocence. Vice President Dogolea and Grupee had been friends since childhood, so perhaps Dogolea would offer some protection unless Grupee's activities called his own position into question. (Dogolea was indeed at risk; he was murdered after Grupee fled, and it is widely believed that President Charles Taylor gave the order for his assassination.) The IJ

did not discuss Grupee's explanation for his actions, and unexplained incredulity is not a good ground for disbelief.

That Grupee obtained a passport is unsurprising. Many dictatorial regimes want their internal opponents silenced and do not much care whether they flee, die, or rot in prison. Departure is cheaper and less likely to draw adverse notice from the press or human-rights watchdogs. Until World War II began, Germany allowed, indeed encouraged, Jewish emigration; this did not imply that Jews were free from persecution. We have made this observation before. See, e.g., *Hengan v. INS*, 79 F.3d 60, 63 (7th Cir. 1996); *Angoucheva v. INS*, 106 F.3d 781, 791 (7th Cir. 1997) (Rovner, J., concurring). The IJ ignored these and similar decisions. What is more, prominent officials have friends in the bureaucracy, and Grupee testified that he had and used such contacts (plus a dollop of cash) to expedite the passport's issuance. Not even a dictator can control all of his subordinates' acts. The IJ did not mention any of this; again all we have is unexplained incredulity.

As for the third and fourth grounds: Grupee *had* set out, on his application for asylum and every occasion thereafter, the grounds given by security forces for his arrest, and he offered not only his brother's affidavit but also reports published in the local press. The IJ misstated the record in asserting otherwise. Producing a report written for LUDA would have been possible only if Grupee had the foresight to take one with him; it would have been hard to anticipate the need. By the time of the hearing, Liberia was in civil war, and getting documentation would have been difficult. Jeremiah Whapoe, LUDA's executive director, testified by affidavit and in person at the removal hearing that Grupee had furnished (in secret) information that LUDA used in reporting human-rights abuses; the IJ did not explain why this evidence was insufficient. None of the IJ's other observations justifies disbelief of Grupee's basic story.

At the tail end of his opinion the IJ added that, even if Grupee had been persecuted on account of his political opin-

ion, he had "failed to establish an objectively reasonable fear of future persecution". The IJ did not explain this statement, which is hard to take seriously. In September 2002, when the IJ issued his opinion, the Taylor regime was clinging to power against determined and well-armed opposition. Grupee's prospects in Liberia would have been bleak. But by February 2004, when the BIA affirmed that decision, Taylor was in exile and a new government had been installed with the support of an international coalition. The Board surprisingly ignored that fundamental event. The latest country report from the State Department says that the new government respects human rights. As one of Taylor's opponents, Grupee might be welcome to serve in the new government, though perhaps his time at Dogolea's side (and what he may have done in that capacity) would be disqualifying. Because the agency has not evaluated the risks that Grupee would face in today's Liberia, however, we must return the matter to it for reconsideration. See *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943); *Miljkovic v. Ashcroft*, 376 F.3d 754, 757 (7th Cir. 2004).

The petition for review is granted, and the matter is remanded to the agency for further proceedings consistent with this opinion.

A true Copy:

  Teste:

        _____
        *Clerk of the United States Court of*
         *Appeals for the Seventh Circuit*