# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-1809

MARY PROSCOVIA NAKIBUKA,

*Petitioner*,

*v.*

ALBERTO R. GONZALES, Attorney
General of the United States,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals
No. A95-575-900

ARGUED MARCH 29, 2005—DECIDED AUGUST 26, 2005

Before CUDAHY, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Mary Proscovia Nakibuka worked in Uganda as a housekeeper for a politically active family that openly opposed the governing regime. During the 2001 presidential campaign, soldiers loyal to the government attacked her employer's house, beat Nakibuka, and threatened to rape and kill her. After the opposition candidate for president was defeated, conditions for political dissidents in Uganda worsened, and Nakibuka fled with the family to the United States. Although the family that employed her was granted asylum, Nakibuka's application was denied in a separate proceeding. An immigration judge (IJ) found that she neither suffered past persecution nor established a likelihood of future persecution if she were to return to

Uganda. The Board of Immigration Appeals (BIA) affirmed without an opinion and Nakibuka petitioned this court for review. We conclude that the IJ's decision is not supported by substantial evidence and accordingly grant Nakibuka's petition for review.

## I

James Babumba was a vocal opponent of Ugandan President Yoweri Kaguta Museveni. He was married to Fiona Babumba, and Nakibuka worked as the family's maid. In 1996, Mr. Babumba had unsuccessfully challenged a Museveni supporter for a seat in the Ugandan parliament. His candidacy, which angered supporters of President Museveni, led to his being beaten and jailed during his campaign. After the 1996 election, the Museveni government continued actively to suppress the activities of potential rivals. For a time, the Babumba family lowered its political profile. In October 2000, however, Dr. Kizza Besigye announced that he would challenge Museveni in the March 2001 presidential election, and Mr. Babumba became Besigye's regional campaign manager. Nakibuka joined other members of the Babumba family in campaigning for Besigye. On her days off, she volunteered in Mr. Babumba's campaign office. She also distributed literature, attended rallies, and helped organize women to support Besigye.

These political activities attracted the attention of the Museveni administration. On the night of February 10, 2001, while Mr. Babumba was working in his campaign office, five men dressed in military uniforms broke into the Babumbas' house. The soldiers dragged Nakibuka and Mrs. Babumba into a bedroom and tied them both up using a particularly painful technique known as the "kandoya" style, in which the arms are pulled behind the back and the elbows are forced together in a way that subjects the chest

to intense stretching and can dislocate the shoulders. While addressing both women by name, the soldiers beat them and demanded that they stop supporting Besigye. One soldier put a gun to Nakibuka's head and cocked the hammer as she pleaded with him that she was only a maid. Another soldier unzipped his pants and threatened to rape Nakibuka, but the group's leader ordered him to stop. The soldiers then demanded information about Besigye's campaign activities and threatened to return if the women and Mr. Babumba did not stop supporting Besigye. Eventually the soldiers left the house, leaving the two women tied up until a gardener discovered them the following morning. Several days after the attack, Sergeant Majid Seganne, a man the Babumbas knew as a member of Museveni's Uganda Peoples' Defense Force (UPDF), began bragging to Mr. Babumba and other Besigye supporters that he had led the attack on the Babumba household. Sergeant Seganne boasted about what his men had done to Nakibuka and Mrs. Babumba and threatened other Besigye supporters with similar fates.

A few weeks later, Museveni defeated Besigye in the presidential election. After his victory, Museveni attempted to locate and punish supporters of Besigye, and the police soon arrested and interrogated Mr. Babumba. Once he was released, Mr. Babumba left Uganda for several weeks to attend an international conference, but he returned in April. Political conditions continued to worsen, causing the Babumbas and Nakibuka to fear additional reprisal by the UPDF. Besigye fled Uganda in August. His flight triggered an increased government crackdown on his supporters. In December, Mr. Babumba sent Nakibuka, his wife, and children to Mbarara, over 100 miles away from their home in the suburbs of the capital city of Kampala. There, they were threatened by a military leader and told that they would be arrested if they remained in Uganda. Nakibuka and the Babumba family members in Mbarara arranged

through a Besigye supporter to depart for the United States in January 2002. Mr. Babumba was arrested again, but managed to leave for the United States three months later. Mr. Babumba was granted asylum, and his wife and children were approved derivatively.

Nakibuka, however, had to file a separate application for asylum, which she did in May 2002. In it, she claimed that she would be arrested or tortured if she returned to Uganda because she was associated with Mr. Babumba, whom she characterized as "an enemy of the government." At her removal hearing, the immigration judge did not make a specific credibility finding. But he denied Nakibuka's application, finding that she had not suffered past persecution because the attack in February 2001 was not sufficiently serious or, alternatively, that she was not attacked for political reasons. The IJ also found in the alternative that the government had rebutted the presumption that she would suffer future persecution, which would have applied had she demonstrated past persecution. The BIA affirmed without an opinion and Nakibuka filed this petition for review.

## II

Where, as here, the BIA summarily affirms the decision of the immigration judge, we review the IJ's decision as if it were that of the BIA. *Brucaj v. Ashcroft*, 381 F.3d 602, 606 (7th Cir. 2004). We will not disturb the IJ's decision provided that it is supported by substantial evidence. *Id.*

Nakibuka first argues that the IJ erred when he found that the harm she suffered was too mild to constitute past persecution. Persecution is defined as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Liu v. Ashcroft*, 380 F.3d 307, 312 (7th Cir. 2004) (internal citation and quotation omitted). An asylum applicant need not show

that her life or freedom were threatened, but the harm she suffered must rise above the level of "mere harassment" and must result from more than unpleasant or even dangerous conditions in her home country. *Id.* (internal citations and quotation omitted). Past persecution may be shown through even a single episode of detention or physical abuse, if it is severe enough. See *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003); *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997). Here, the IJ found that Nakibuka was detained and tied up overnight during the soldiers' invasion of the Babumbas' home and that she was slapped and kicked but not severely harmed or beaten continuously. But, as Nakibuka points out, the IJ said nothing about her testimony that one of the soldiers pressed a gun to her head and threatened to kill her while another unzipped his pants and threatened to rape her, and that she was tied in the excruciating "kandoya" style.

The testimony that the IJ ignored was central to Nakibuka's claim of persecution. A death threat, especially one that is accompanied by an attacker pressing a gun to the victim's head, is a serious factor supporting a finding of persecution. See *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997) (threats "of a most immediate and menacing nature" may constitute past persecution); *Mitev v. INS*, 67 F.3d 1325, 1331 (7th Cir. 1995) (noting severity of death threat "emanating directly from the secret police"). The IJ also minimized Nakibuka's complaints about the attempted rape, noting that "another soldier intervened and prevented such an attack." But we are unwilling to dismiss so casually a threat of imminent rape. The threatened rape was one way for the soldiers to express their domination and control over both Nakibuka and Mrs. Babumba, see *Ali v. Ashcroft*, 394 F.3d 780, 787 (9th Cir. 2005), as well as a way to send a message to the women about what might happen if they and Mr. Babumba did not stop supporting Besigye, see *Lopez-Galarza v. INS*, 99 F.3d 954, 959 (9th Cir. 1996)

(rape is a form of persecution if done on account of victim's actual or imputed political opinion). The IJ failed to consider these possibilities. Nakibuka also correctly notes that the IJ's use of the term "tied up" for what happened to Mrs. Babumba and herself was euphemistic at best, given the reality of the "kandoya" technique. Nakibuka explained in her affidavit that their "elbows were made to touch and a rope was tied around both hands, causing [their] chests to stretch out and causing an unimaginable amount of pain." Their feet were also bound together in front of them. The IJ did not even address these complaints of "unimaginable" pain.

Although Nakibuka focused her arguments primarily on the single attack in February 2001, she also pointed to other evidence that the IJ ignored concerning events that took place after that time. The IJ found that the February 2001 incident had not been as serious as Nakibuka claimed because she "did not flee Uganda after this attack, but remained in the same home working as a household keeper until December 2001." But an asylum applicant's decision not to flee her home country immediately does not mean that she was not persecuted. See *Niam v. Ashcroft*, 354 F.3d 652, 658 (7th Cir. 2004) (asylum applicant waited three years before fleeing). Moreover, Nakibuka's last ten months in Uganda were marked by increasing threats against the Babumbas—threats that were so severe that Mr. Babumba was forced to live apart from his family to avoid the authorities, and Nakibuka, Mrs. Babumba, and the children sought refuge in Mbarara with only limited success.

Furthermore, we cannot agree with the IJ's finding that Mr. Babumba's return in April 2001 to Uganda from the international conference showed that neither the February attack nor the additional threats against the family "were serious enough to constitute past persecution." Mr. Babumba explained that he returned to Uganda in April because he did not want to abandon his family and because

he had hoped the political situation would improve after President Museveni's reelection in March. But Mr. Babumba's hopes for political calm were later dashed; the situation became so dangerous for opposition supporters that their leader, Besigye, fled the country, Mr. Babumba went into hiding, and Nakibuka fled to Mbarara with the rest of the Babumba family. Mr. Babumba was later arrested, beaten, and threatened with execution, and the rest of the family was threatened in Mbarara by a military officer because of their support for Besigye. Mrs. Babumba explained in her affidavit that Nakibuka was "identified" as a member of the Babumba family and that she "faced the same harassment" and "was as vulnerable as all of us were" because of her personal involvement with the family and the Besigye campaign.

Neither the IJ nor the BIA considered the severity of the attack against Nakibuka or the escalating nature of the events that followed it. In our view, Nakibuka presented ample evidence that the harm she suffered was serious enough to characterize as past persecution, rather than mere harassment. See *Liu*, 380 F.3d at 312.

Nakibuka next challenges the IJ's alternative finding that she was not persecuted for political reasons. It was indeed her burden to show that the reason for her persecution was one recognized by the statute—that is, it was "for political, religious, or other reasons that this country does not recognize as legitimate." See *Bace v. Ashcroft*, 352 F.3d 1133, 1137 (7th Cir. 2003); see also *Tolosa v. Ashcroft*, 384 F.3d 906, 910 (7th Cir. 2004) (asylum applicant may show that persecutor imputed a political opinion to her). The IJ inferred from the record that Nakibuka was merely "in the wrong place at the wrong time." The IJ also found it significant that she "admitted to her attackers that she was only the maid."

The IJ's finding that Nakibuka's statement that she was

"only the maid" somehow negated a finding of persecution is troubling for a number of reasons. First, the IJ seized upon her comment completely out of context. According to her testimony, she referred to herself as only a maid while she was at gunpoint in the midst of the attack by the soldiers: "They beat us up repeatedly and they asked us why we supported Besigye. I appealed to them, explaining that I was just a worker. Then another man come out with a gun and (indiscernible) on my head, and said what are you talking about?" Under such life-threatening circumstances, it was hardly unreasonable for her to downplay her affiliation with the Babumbas or her opposition to the ruling regime. The relevant question here is whether Museveni's supporters perceived—correctly or not— Nakibuka as a political opponent. See *De Brenner v. Ashcroft*, 388 F.3d 629, 635-36 (8th Cir. 2004) (inquiry must focus on whether persecutor, rightly or wrongly, attributes a political opinion to victim); *Vasquez v. INS*, 177 F.3d 62, 65 (1st Cir. 1999) (same); *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997) (same). Mrs. Babumba's affidavit states that "we consider and treat her, as she does us, as family" and that Ugandan authorities consider Nakibuka a dissident "based upon her connection to Dr. Kizza Besigye through my husband." The IJ gave no reasons for why he found Mrs. Babumba's explanation of the attackers' motives to be incredible, nor did he address whether Museveni's supporters saw Nakibuka as a political opponent. These omissions were error and must be corrected.

Nakibuka also argues that the IJ improperly rejected her related argument that she was persecuted based on her own political opinion in addition to the political opinion she says the attackers imputed to her. Nakibuka testified that she volunteered on Besigye's campaign, attended meetings, and specifically worked to rally women to support him. Both Babumbas verified that Nakibuka freely joined the campaign, worked in the office, and participated in campaign

events. The IJ, however, dismissed this evidence, saying that Nakibuka's testimony was "vague and confusing" and that "[t]his court believes that the respondent's activities were exaggerated and that she simply worked as a household maid for her employer." But the IJ never made an adverse credibility finding with respect to either Nakibuka or the Babumbas; any passing reference implying doubt about Nakibuka's testimony is not an adequate substitute for an explicit credibility finding. See *Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005); *Mendozo Manimbao v. Ashcroft*, 329 F.3d 655, 661 (9th Cir. 2003). Finally, even if he had made a credibility finding, the IJ never explained why he rejected not only Nakibuka's testimony, but also that of her two corroborating witnesses, that she campaigned for Besigye. The IJ's unwillingness to believe that Nakibuka personally engaged in campaign activities is unsupported by the record and thus could not have provided the basis for an adverse credibility finding. See *Huang v. Gonzales*, 403 F.3d 945, 949-50 (7th Cir. 2005); *Lin v. Ashcroft*, 385 F.3d 748, 755-56 (7th Cir. 2004).

Nakibuka next argues that the IJ improperly found that even if she had suffered past persecution on account of a political opinion, her claim still failed because the government rebutted the presumption that she would suffer future persecution. See *Bace*, 352 F.3d at 1137 (finding of past persecution creates a rebuttable presumption of future persecution). The IJ gave three reasons for finding that the government met its burden, but all are speculative and unsupported by the record. First, the IJ said that Nakibuka cannot have an objective fear of persecution because her immediate family remains in Uganda and has not been targeted by the UPDF. Even though evidence that an asylum applicant's family members remain unharmed in their home country may support a finding that the applicant is unlikely to suffer future persecution, see *Ambati v. Reno*, 233 F.3d 1054, 1061 (7th Cir. 2000); *Bhatt v. Reno*,

172 F.3d 978, 982 (7th Cir. 1999), in this case there was no evidence that Nakibuka's relatives supported Besigye's candidacy or that Museveni's supporters identified any of those relatives as associates of the Babumbas. That Nakibuka's relatives—who as far as the record reflects are neither politically active nor closely associated with known opponents of the government—have not been harassed does not mean that Nakibuka herself will be safe in Uganda.

Next, the IJ said that Nakibuka would be unlikely to face persecution because Besigye and the Babumbas have all fled Uganda and she would thus no longer be associated with a political enemy of the government. The government interprets these facts to mean that Nakibuka has nothing to fear in Uganda because she was not a prominent supporter of Besigye and would only be "recognized as the former housekeeper of Mr. Babumba." We cannot agree with this assessment. Mrs. Babumba's affidavit states that the soldiers "knew who we [Nakibuka and Mrs. Babumba] were because they used our names when insulting and interrogating us that night." The soldiers' knowledge of Nakibuka's name suggests that she was already more than Mr. Babumba's maid. Moreover, the record does not contain any information suggesting that the UPDF is any more tolerant of political opponents now than it was in 2001. Finally, it seems odd for the IJ to believe that an opponent of an oppressive government will somehow be safer simply because the government has been so successful in cracking down on its opposition that all higher-level political allies have been forced out of the country. See *Osaghae v. INS*, 942 F.2d 1160, 1164 (7th Cir. 1991) ("Asylum is not limited to the notorious.").

Last, we note that the IJ opined that the Ugandan government's issuance of a visa to Nakibuka shows that it has no interest in persecuting her. Nakibuka does not address this point in her brief, but we reiterate our recent

observation that oppressive governments that want to eliminate their political opponents may find that allowing them to leave the country is easier than having them jailed or killed. See *Grupee v. Gonzales*, 400 F.3d 1026, 1027 (7th Cir. 2005). Nakibuka's ability to obtain a visa thus tells us nothing about the likelihood that she will be persecuted in the future.

### III

The IJ's decision is not supported by substantial evidence. Nakibuka presented credible and corroborated testimony that she suffered harm severe enough to constitute past persecution because of either her own political opinion or an imputed political opinion. The government did not rebut the presumption that she will suffer future persecution in Uganda. On remand, the BIA must re-evaluate her claim for asylum in light of these facts, as well as anything else it deems relevant at this point. Accordingly, we GRANT Nakibuka's petition for review and VACATE the order of removal.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*