# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-2269

CAHIT DURGAC and OZGUR YASAR,

*Petitioners,*

*v.*

ALBERTO GONZALES, Attorney General
of the United States,

*Respondent.*

On Petition for Review of an Order of
the Board of Immigration Appeals.
Nos. A95 413 126 & A95 413 127

ARGUED AUGUST 3, 2005—DECIDED DECEMBER 5, 2005

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Cahit Durgac, a Kurdish university student from Turkey, applied for asylum on behalf of himself and his wife, Ozgur Yasar, contending that he was detained and beaten by the Turkish security services because he formed a Kurdish study group. The Immigration Judge (IJ) denied the application, finding that Durgac was not credible and that he did not have a well-founded fear of future persecution. The Board of Immigration Appeals (BIA) affirmed without opinion. Because we conclude that the reasons the IJ gave for rejecting Durgac's credibility do not, even under deferential review, support his conclusion, we grant the petition for review and remand for further proceedings.

**I**

At his immigration hearing (which also covered Yasar as a derivative applicant), Durgac recounted the following sequence of events. In late 2000, upon returning to Turkey from a four-month visit to the United States, he founded a study group dedicated to learning more about his Kurdish heritage. The group was comprised mostly of other Kurdish students, but several ethnic Turks were also members, including Durgac's future wife Ozgur Yasar. The students openly met either in the cafeteria at the University of Erciyes in Nevsehir or, less frequently, in a member's home to discuss Kurdish politics, literature, and history, and to brush up on their Kurdish language skills, which were rusty because of restrictions the Turkish government places on speaking Kurdish in public. The group's activities, and in particular their uninhibited use of the Kurdish language, soon attracted the attention of police officers at the university. The police "ke[pt] a close eye" on the group, as did a number of Turkish nationalist students who, according to Durgac, swore at members of the group and put psychological pressure on them. On several occasions, there were physical confrontations between the group members and the rival students, including a fistfight between Durgac and a nationalist student in early February 2001.

About a month later, as Durgac was walking from the university to his apartment, a police car pulled up and two officers jumped out, grabbed him by the neck, and dragged him into the car. The officers took him to a police station. There, according to his testimony, they "took me into a room where they continued to swear at me and punch me and hit me in the back, and then they blindfolded me." The police held him for 18 days, fed him "dirty food and water," and beat him severely three times, striking him repeatedly in the back, stomach, and knees. Although the officers did not question him or demand to know his name, he saw them

take his identification card from his wallet just before he was blindfolded. They "hurled insults" at him, told him that he "needed to accept the authority of the state," and called him a "traitor" because his brother had sought asylum in Great Britain. (Durgac's brother fled Turkey in 1994 because of his membership in several Kurdish groups and was apparently granted refugee status in the United Kingdom in 2000. Durgac testified that following his brother's departure, he and his parents often noticed the police watching them.)

The police released Durgac in mid-March 2001. At that time, they warned him not to meet with his Kurdish study group and to stop dating Yasar because she is not Kurdish. Durgac heeded the first part of that advice, in part because he heard that another member of the group had suffered an ordeal similar to his, but his problems continued. He began receiving threats from several of the nationalist students, who wanted him to inform on his friends. Durgac testified that he was afraid to go to the police, because they were in league with the nationalists and might again detain and beat him. Several weeks after his release, he concluded that he had no choice but to leave Turkey. He applied for the renewal of his passport. Although there were "some difficulties" and the process took longer than usual, he received it in May and he left for the United States on June 1.

After listening to this testimony, the IJ denied Durgac's application, finding that he had failed to provide "credible probative evidence." His first and principal reason for this decision was his skepticism that the police would single out someone who was merely a member of a Kurdish study group. As the IJ put it, "The respondent was not an activist supporting Kurdish rights, was not outspoken, did not make public appearances or speeches against the Turkish government, but simply met with friends privately to discuss Kurdish history and language." The IJ also provided five

additional reasons for his adverse credibility finding: (2) he found it suspicious that the officers did not interrogate Durgac or ask him his name; (3) he noted that Durgac had been able to leave Turkey without difficulty; (4) Durgac had testified inconsistently about which branch of the police had detained him; (5) the IJ thought it "conspicuous" that Durgac was unable to provide any evidence corroborating the fact of his detention; and (6) he did not believe that the local police would have had any information about Durgac's brother at the time Durgac was detained.

The BIA affirmed the IJ's decision without opinion. At the same time, it denied Durgac's motion to remand in order to present new evidence, including additional human rights reports from Amnesty International, the United Nations, and the British and Canadian governments. Durgac filed a timely petition for review with this court. Later, we granted a stay of removal pending the resolution of the petition.

## II

In order to qualify for asylum, Durgac must demonstrate that he meets the statutory definition of "refugee," which in turn requires him to show that he is unable or unwilling to return to Turkey "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). When, as here, the BIA affirms an IJ's ruling without opinion, this court reviews the IJ's decision. See *Soumahoro v. Gonzales*, 415 F.3d 732, 736 (7th Cir. 2005); *Lin v. Ashcroft*, 385 F.3d 748, 751 (7th Cir. 2004). We review the IJ's decision under the deferential substantial evidence test and will reverse only if the evidence compels a different result. *Mitreva v. Gonzales*, 417 F.3d 761, 764 (7th Cir. 2005); *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004). As one would suspect from that standard, outright reversal is almost

never called for. More commonly, petitions for review will be granted when the court concludes that there is more that must be done at the agency level before a final conclusion on an asylum application is possible. That is the context in which the rule requiring the IJ's credibility findings to be supported by specific, cogent reasons that are based in substantial evidence should be understood. See *Lin*, 385 F.3d at 751.

We turn therefore to a review of the reasons the IJ gave here for rejecting Durgac's petition. First, the IJ was skeptical that the activity of meeting privately with others to study Kurdish culture would elicit a hostile response from the Turkish government. But, to begin with, this overlooks the fact that most of the group's meetings were not in private; they were in the university cafeteria in full view of others, including the unsympathetic nationalist students. The State Department Country Report for 2002 confirms that similar expressions of Kurdish culture have led to mistreatment by the Turkish government. It comments, for example, that "Kurds who publicly or politically asserted their Kurdish identity or publicly espoused using Kurdish in the public domain risked public censure, harassment, or prosecution." It goes on to list the examples of a 14-year-old boy who was detained and beaten by authorities merely for saying that he was "proud to be a Kurd," and four parents who were imprisoned for petitioning for Kurdish-language education for their children. The Report also describes police interference with Kurdish groups: "Police exerted pressure against Kurdish cultural groups and hindered their activities, and local officials monitored and often interrupted their cultural events." This material directly corroborates Durgac's narrative.

The IJ's second reason for disbelieving Durgac's account rested on Durgac's statement that he was detained without being interrogated or asked to identify himself. Taking the

latter point first, the record shows that this was not at all mysterious. Durgac's own testimony explained why the police did not need to ask him anything about his identity: they took his identification card directly from his wallet. More fundamentally, the fact that they snatched him off the street suggests that they already knew who he was: why abduct a random man and then later check his identity to see if he was worth abducting? The lack of interrogation would be important only if it is an inevitable part of a detention. The Country Report discusses the use of beatings and torture during incommunicado detentions in Turkey, but it nowhere states that interrogation is always a feature of these unfortunate sessions. Only impermissible speculation would support a finding that a search for more information, rather than a desire to punish and intimidate, lay behind the police's actions. See *Chen v. Gonzales*, 420 F.3d 707, 710 (7th Cir. 2005); *Korniejew v. Ashcroft*, 371 F.3d 377, 383 (7th Cir. 2004), citing *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002).

The IJ's next reason was that the Turkish government was willing to issue Durgac a passport and allow him to leave the country. We have pointed out on other occasions that governments are often happy to see members of "undesirable" ethnic groups or other alleged troublemakers depart. See, *e.g.*, *Grupee v. Gonzales*, 400 F.3d 1026, 1027 (7th Cir. 2005) ("Many dictatorial regimes want their internal opponents silenced and do not much care whether they flee, die, or rot in prison."); *Hengan v. INS*, 79 F.3d 60, 63 (7th Cir. 1996); see also *Angoucheva v. INS*, 106 F.3d 781, 791 (7th Cir. 1997) (Rovner, J., concurring). To the extent that this point carries some weight, it supports rather than undermines Durgac's credibility.

In his asylum application (filled out in English by another person), Durgac says that the "Jandarma" or secret police had monitored his activities at the university, but at the

hearing he testified (in Turkish) that the "civil police" monitored and detained him. The IJ regarded this discrepancy as a further reason to reject his credibility. He questioned why the civil police rather than the Jandarma would have detained Durgac, since the Jandarma are the ones with the responsibility for investigating illegal Kurdish activities. But once again, this admitted discrepancy does not amount to a reason to reject Durgac's credibility. The Country Report itself states that the civil police have "primary responsibility for security" over cities like Nevsehir, while the Jandarma operate in the countryside. The government responds that Durgac would have noticed the conspicuous word "Jandarma" when looking over the written application, but, apart from the fact that the record does not reflect what the word would have looked like in the distinctive Turkish alphabet and thus whether Durgac would have recognized the English version, this minor inconsistency is immaterial. See *Ssali v. Gonzales*, 424 F.3d 556, 564 (7th Cir. 2005); *Uwase v. Ashcroft*, 349 F.3d 1039, 1043 (7th Cir. 2003). What matters is the fact of Durgac's detention by the security services, not which discrete branch actually collared him.

The IJ's next reason was in keeping with the perennial search for corroborating evidence. See generally *Dawoud v. Gonzales*, 424 F.3d 608, 612-14 (7th Cir. 2005). Here, he found Durgac's testimony wanting in credibility because Durgac had no evidence corroborating his 18-day detention and abuse. But, as our sister circuit held, an IJ may not require an asylum applicant to obtain corroborating evidence directly from his abusers. See *Ahmadshah v. Ashcroft*, 396 F.3d 917, 921 (8th Cir. 2005). That is exactly what the IJ apparently wanted here, when he asked "Did you get a record of being detained 18 days? I mean, did they have to give you a paper showing that you were released?" Perhaps the IJ was also concerned about the fact that Durgac never sought medical treatment for his injuries, but

failing to supply medical evidence is not inconsistent with having been abused. Cf. *Abdulrahman v. Ashcroft*, 330 F.3d 587, 598 (3d Cir. 2003); *id.* at 600 (Becker, J., concurring, noting that not all beatings leave scars that are susceptible to medical corroboration). The State Department Country Report stated that "[h]uman rights observers and medical experts said that security officials [in Turkey] often used methods that did not leave physical traces." The IJ also thought that the delay of several weeks between Durgac's release and his decision to leave the country undermined his account, but we have held that "an asylum applicant's decision not to flee her home country immediately does not mean that she was not persecuted." *Nakibuka v. Gonzales*, 421 F.3d 473, 477 (7th Cir. 2005). Moreover, Durgac *did* explain that he decided to depart as soon as it became clear that the threats from the nationalist students would continue unabated. He left as soon as his passport was renewed, unlike some petitioners who linger for a year or more. Compare *Kondakova v. Ashcroft*, 383 F.3d 792, 797 (8th Cir. 2004) (remaining in country for a year inconsistent with persecution).

Finally, the IJ discredited Durgac because he did not believe that the police would have known about Durgac's brother's bid for asylum in 1994. Durgac points to his brother's affidavit (which, contrary to the representations of both parties, is in the record), in which the brother states that after he applied for asylum, members of the Turkish community reported his case to the Turkish consulate. If that were all, we think that the IJ would be justified in finding it implausible that a different government agency would know of the brother's application seven years later. But the relevant time gap may not have been so long, because the brother was apparently not granted asylum until 2000, right around the same time that Durgac was experiencing problems. Furthermore, Durgac's testimony indicates that the police had not been inactive between

1994 and 2000; instead, they were lurking around Durgac and his family, watching their actions. Thus, the inference the IJ drew was a weak one at best. Standing alone, it is not enough to support the adverse credibility finding. See *Hengan*,79 F.3d at 63.

In addition to rejecting Durgac's credibility with respect to past events, the IJ separately found that he failed to demonstrate a well-founded fear of future persecution. But his analysis of that distinct ground for relief relies on the same factors we have just discussed: speculation that a Kurdish study group member would have nothing to fear in Turkey, and Durgac's ability to leave the country. These points do not amount to substantial evidence indicating the absence of a well-founded fear. The IJ also rejected Durgac's claim that he feared return because he might be conscripted for military service or face trouble because of his mixed marriage (Yasar, recall, is an ethnic Turk). Even if this were correct, and we see nothing that undermines that part of the IJ's decision, Durgac relied on these arguments only peripherally. His primary contention is that he has suffered persecution because of his Kurdish ethnicity.

We conclude that the IJ's adverse credibility determination is not supported by substantial evidence. Durgac's credibility must be reassessed in light of this opinion. If he is found to be credible, then the IJ must determine whether an 18-day detention coupled with blindfolding, underfeeding, and multiple beatings amounts to past persecution, and if so, whether the government can rebut the presumption that would arise of a well-founded fear of future persecution.

The petition for review is GRANTED and the case is returned to the Board for further proceedings. In light of our ruling on the petition, we need not reach Durgac's claim that the BIA abused its discretion when it denied his motion to reopen.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*