In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 07-2702

JALAL ABU HAMDAN,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A95-925-237

_____

ARGUED APRIL 10, 2008—DECIDED JUNE 16, 2008

_____

Before FLAUM, KANNE, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* Jalal Abu Hamdan sought with-
holding of removal, 8 U.S.C. § 1231(b)(3)(A), and protec-
tion under the Convention Against Torture (CAT), 8
C.F.R. §§ 1208.16, 1208.18, claiming that he suffered past
persecution when he lived in the Israeli-occupied West
Bank from 1994 until 1997, and that he would likely be
persecuted if he returned there today. The immigration
judge (IJ) denied his requests for relief, a decision that
the Board of Immigration Appeals (BIA) upheld. Hamdan
petitions us to review the immigration courts' decisions,

arguing that the IJ failed to address his claims of future persecution. We agree with Hamdan, and grant his petition.

## I. HISTORY

Hamdan is a "stateless" Palestinian—he was born in the West Bank when the area was governed by Jordan, but was not allowed to apply for Jordanian citizenship because of his Palestinian identity. He entered the United States in April 1997 on a student visa to attend the University of Illinois at Chicago. But after immigration authorities determined in 2003 that Hamdan had never, in fact, attended UIC, they initiated removal proceedings against him. *See* 8 U.S.C. § 1227(a)(1)(C)(I).

Hamdan appeared before the IJ and conceded removability. However, he also filed an application for asylum, withholding of removal, and CAT protection, in which he claimed that the Israeli government and Palestinian Authority persecuted him when he lived in the West Bank. Hamdan also asserted that if he were to return to the West Bank, it was likely that he would be harmed by the Israeli government and Palestinian militant groups because of his Palestinian identity and imputed political beliefs. *See id.* § 1231(b)(3)(A) ("[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's . . . nationality . . . or political opinion."); 8 C.F.R. § 1208.16(b)(2) (stating that to successfully obtain CAT protection, petitioner must show that it is more likely than not that he will be tortured by foreign government, or by its acquiescence, upon removal). In the

alternative, Hamdan sought leave to depart the United States voluntarily. *See* 8 U.S.C. § 1229c(a)-(b).

At a subsequent hearing regarding his requests for relief, Hamdan explained to the IJ the claims of persecution he presented in his application. Hamdan first stated that he received his Master's Degree in Archeology in 1994 from the University of Jordan. Shortly thereafter, he was hired by the Israeli government's Department of Archeology as a supervisor of archeological excavations. Most of the laborers at the excavation sites were Palestinian, and Hamdan's good rapport and constant interaction with his Israeli supervisors and coworkers—including armed Israelis who were charged with providing security to the excavation sites—along with the fact that he "made good money," fueled speculation among the Palestinians that he was an Israeli spy.

Hamdan continued that, about two years after the Israeli Department of Archeology hired him, Israel began transferring may aspects of civil governance in the West Bank to the Palestinian Authority. As a part of this transfer, Hamdan's employer changed to the Palestinian-controlled Department of Archeology. Nevertheless, Hamdan's Palestinian coworkers and superiors became increasingly suspicious of him because of his past interactions with Israeli officials. And even though Hamdan remained "politically neutral" between the Israeli and Palestinian causes and abstained from political activity, he sensed that his neutrality angered several Palestinian political and militant groups, and also bolstered the misconception that he was an Israeli collaborator.

Hamdan further explained that he left for the United States after it became clear to him that his political neutrality prevented his advancement within the Palestinian

Department of Archeology; political patronage ran rampant throughout the department, but because Hamdan shunned Palestinian political parties he lacked the requisite connections to rise through the department's ranks. Then, about two years after he left the West Bank, the Second Intifada—the violent Palestinian uprising against the occupying Israeli presence—began. Hamdan's family in the West Bank informed him that, as a part of the Israeli reaction to the uprising, their village was completely walled-off; Hamdan's family also recounted that armed Palestinian militant groups roamed the streets at night, and that neither the Israeli government, nor the Palestinian Authority, could control them. As a further attempt to quell the violence, the Israeli government imposed severe restrictions on the employment of Palestinians. As such, "there [are] no jobs for educated people now," as Hamdan explained. Even more, whatever archeologist jobs may exist would be based in Ramullah, a city to which Hamdan would not be able to travel because of the Israeli government's restrictions.

To support his description of life in the West Bank during the Second Intifada, Hamdan submitted to the IJ the U.S. Department of State's *2004 Country Report on Human Rights Practices for Israel and the Occupied Territories*. The *2004 Report* recounted that the Israeli government responded to the uprising with military force; curfews; travel restrictions; closures of schools, universities, businesses, and places of worship; and the construction of a security barrier over 6,900 acres of privately owned land. The *2004 Country Report* also stated that Palestinian militant groups killed, injured, or arbitrarily detained Palestinians suspected of collaborating with Israel; in fact, the report called the torture of suspected collaborators "widespread."

In all, Hamdan claimed that if he were forced to return to the West Bank, he would suffer a substantial economic hardship amounting to persecution because of the employment restrictions the Israeli government placed on Palestinians. He also asserted that he would likely be abducted, injured, or killed by Palestinian militant groups because of their belief that he was politically affiliated with the Israeli government. Hamdan accordingly asked the IJ to grant him either withholding of removal or protection under the CAT.

After Hamdan finished testifying, the IJ denied his requests for relief from removal. The IJ first determined that Hamdan failed to file his asylum petition within the requisite one year of his entry into the United States, and that the application's untimeliness was not excused by either extraordinary or changed circumstances. *See id*. § 1158(a)(2)(B), (a)(2)(D); *Hussain v. Keisler*, 505 F.3d 779, 781-82 (7th Cir. 2007). The IJ then declared that, although Hamdan's testimony regarding his experiences while living in the West Bank was entirely credible, he failed to proffer any evidence showing that either the Israeli government or Palestinian Authority persecuted him.

The IJ continued that Hamdan also did not establish that he would likely be persecuted upon his return to the West Bank. As to Hamdan's claim of future persecution at the hands of the Israeli government, the IJ eschewed any discussion of Hamdan's claim of economic persecution; instead, the IJ made the puzzling statement that, although "[t]here is indication, in this case, that the Israeli government would torture" Hamdan, it was "improbable" that the government "would do so in the future." The IJ also stated that Hamdan failed to show that

Palestinian militant groups would likely harm him upon his return. In so concluding, the IJ characterized Hamdan's claim not as one based on imputed political opinion, but instead as one based solely on his political neutrality. As the IJ saw it, Hamdan claimed that militant groups would persecute him because he tried to remain neutral between the Palestinian Authority and the Israeli government. But, the IJ concluded, Hamdan "never affirmatively expressed his neutrality" to the militant groups themselves, and thus could not prove that the groups would harm him because of his neutrality. The IJ did, however, permit Hamdan to depart voluntarily.

Hamdan appealed the IJ's decision to the BIA, arguing, among other things, that the IJ erred by concluding that he failed to establish that he would likely be persecuted upon his return to the West Bank. In rejecting Hamdan's argument, the BIA merely "adopt[ed] and affirm[ed]" the IJ's determination "to the extent he found that [Hamdan] failed to meet his burden of proof to establish eligibility for relief from removal." The BIA then dismissed Hamdan's appeal and entered a final order of removal.

## II. ANALYSIS

In his petition, Hamdan does not challenge the IJ's determination that his asylum application was untimely; he likewise does not claim that the IJ erred by concluding that he was not persecuted when he lived in the West Bank. *See Lin v. Ashcroft*, 385 F.3d 748, 750 (7th Cir. 2004) (stating that petitioner abandoned arguments by not raising them in opening brief). Instead, Hamdan solely argues that the IJ erred by failing to address his claims that (1) because of his Palestinian identity, the

Israeli government will impose on him severe economic hardship that amounts to persecution; and (2) Palestinian militant groups will harm him because of their belief that he is (at least) an Israeli collaborator or (at most) an Israeli spy.[1] He therefore asks us to grant his petition and remand his case so the IJ can assess his claims in the first instance. *See Salameda v. INS*, 70 F.3d 447, 451-52 (7th Cir. 1995); *see also Binrashed v. Gonzales*, 502 F.3d 666, 673-75 (7th Cir. 2007); *Tolosa v. Ashcroft*, 384 F.3d 906, 910-11 (7th Cir. 2004).

The government contends, however, that we lack jurisdiction to address Hamdan's arguments; according to the government, Hamdan failed to exhaust "all administrative remedies available" to him regarding his claims of future persecution. 8 U.S.C. § 1252(d)(1). Specifically, the gov-

---

[1] In his petition, Hamdan describes his claim of future persecution at the hands of Palestinian militant groups as being based on two separate grounds: (1) his imputed political allegiance with the Israeli government; and (2) his membership in the social group of Palestinians who were formerly employed by Israelis and who may be seen as collaborators. *See* 8 U.S.C. § 1231(b)(3)(A) ("[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's . . . membership in a particular social group, or political opinion."). But Hamdan's description creates a distinction without difference: both grounds for relief are premised on the same contention that militant groups believe that Hamdan is an Israeli collaborator or spy. Thus, Hamdan's two grounds for relief are actually one: that he would face persecution upon his return to the West Bank because of his imputed political alliance with the Israeli government.

ernment asserts that Hamdan "failed to articulate any argument" before the BIA regarding his claims of future persecution based on his Palestinian identity or imputed political opinion specifically. As the government sees it, Hamdan instead argued only that the IJ failed to make "an explicit credibility determination" regarding his claim of future persecution. The government thus contends that, because Hamdan failed to forward any "semblance of an argument" that the IJ failed to address his specific claims of future persecution, *see Margos v. Gonzales*, 443 F.3d 593, 598-599 (7th Cir. 2006), we lack the authority to hear Hamdan's case, *see* 8 U.S.C. § 1252(d)(1); *Hamdan v. Gonzales*, 425 F.3d 1051, 1059 n.14 (7th Cir. 2005).

However, the record belies the government's characterization of Hamdan's submission to the BIA. Hamdan did, in fact, challenge the IJ's decision rejecting his claims of future persecution for reasons other than the IJ's credibility findings. Specifically, Hamdan argued that the IJ erred by concluding that he "could not demonstrate that he is 'more likely than not' to be persecuted and tortured." Hamdan also asserted that the IJ's denial of relief was inexplicable, particularly when the IJ made contradictory findings; for instance, Hamdan pointed out that "[a]t one point the IJ seems to agree that [he] would suffer persecution, yet finds that he would not be faced 'with any more risk than that of other inhabitants of the West Bank.'" And although Hamdan's submission to the BIA was not as detailed or as thorough as his brief filed with this court, it sufficiently put the BIA on notice that he sought to challenge the IJ's denial of his claims of future persecution. *See Kaganovich v. Gonzales*, 470 F.3d 894, 897 (9th Cir. 2006) ("Petitioner's notice of appeal to the BIA asserted that the 'Immigration Judge erred in disregarding that [Petitioner]

entered the United States as a refugee.' That statement 'was sufficient to put the BIA on notice . . . and the agency had an opportunity to pass on this issue.' " (quoting *Zhang v. Ashcroft*, 388 F.3d 713, 721 (9th Cir. 2004))); *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 422 (3d Cir. 2005) ("[S]o long as an immigration petitioner makes some effort, however insufficient, to place the Board on notice of a straight-forward issue being raised on appeal, a petitioner is deemed to have exhausted her administrative remedies."). We thus cannot say that Hamdan's submission lacked the "semblance of an argument" that is characteristic of an unexhausted claim. *See Margos*, 443 F.3d at 599 (deeming claim unexhausted when argument was based on ex-tremely "broad generalities" that lacked explanation either "through text or citation").

With that said, we move to Hamdan's contentions that the IJ failed to address his claims of future persecution. Although the BIA's opinion in this case added very little to the IJ's decision, the IJ's decision, as supplemented by the BIA's terse opinion, is our basis for review. *See Brucaj v. Ashcroft*, 381 F.3d 602, 606 (7th Cir. 2004). By seeking withholding of removal and CAT protection, Hamdan bore the burden of pointing to evidence showing that it is "more likely than not" that he will be persecuted be-cause of his Palestinian identity or imputed political opinion if he returns to the West Bank. *See Shmyhelskyy v. Gonzales*, 477 F.3d 474, 482 (7th Cir. 2007); *see also Ahmed v. Ashcroft*, 348 F.3d 611, 617 (7th Cir. 2003) (stating that future persecution based on imputed political opinion is basis for relief from removal); *Borca v. INS*, 77 F.3d 210, 216 (7th Cir. 1996) (stating that "substantial economic disadvantage" that is " 'deliberately imposed' as a form of punishment" can constitute basis for relief from removal

(quoting *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir. 1969))). The IJ determined that Hamdan failed to shoulder this burden, a conclusion to which we normally afford a great amount of deference. *See* 8 U.S.C. § 1252(b)(4)(B) (stating that immigration courts' findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"); *Feto v. Gonzales*, 433 F.3d 907, 911 (7th Cir. 2006) (stating that we affirm immigration courts' decisions so long as they are supported by "reasonable, substantial, and probative evidence" (internal quotation marks and citation omitted)). But our "[d]eference is earned; it is not a birthright." *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007). And we will not yield to the IJ's conclusions if he failed to respond to the arguments that Hamdan presented, *see Salameda*, 70 F.3d at 451-52, or based his conclusions on a misunderstanding of Hamdan's claims for relief, *see Iao v. Gonzales*, 400 F.3d 530, 533 (7th Cir. 2005); *Tolosa*, 384 F.3d at 910-11; *see also Hengan v. INS*, 79 F.3d 60, 63 (7th Cir. 1996) (vacating denial of relief from removal where IJ's focus on facts irrelevant to petitioner's claim suggested that IJ misunderstood arguments altogether).

Hamdan is correct that the IJ failed to examine his claims of future persecution. The IJ did not address Hamdan's contention that he would be economically persecuted by the Israeli government because of his Palestinian identity. The IJ instead concluded—with little explanation, at that—that it was "improbable" that the Israeli government would "torture" Hamdan. But the IJ's conclusion is nonsensical; Hamdan never asserted that the Israeli government would "torture" him, and the conclusion that the Israelis would not torture Hamdan contradicted the IJ's earlier finding that there was, in fact,

an "indication" that the "Israeli government would torture" him.

The IJ similarly failed to address Hamdan's claim that Palestinian militant groups would likely harm him upon his return to the West Bank. When denying Hamdan's request for relief, the IJ merely concluded that Hamdan failed to establish that he would be persecuted because the militant groups were unaware of his self-declared political neutrality. But in so concluding, the IJ misconstrued Hamdan's claim. Hamdan never contended that he would likely be persecuted because of his political neutrality. Instead, he asserted that Palestinian militant groups would persecute him because they imputed to him a political affiliation with the Israeli government. Hamdan even supported this assertion with evidence, such as his testimony—which the IJ deemed credible—and the *2004 Country Report*. As such, it makes little difference that Hamdan, as the IJ put it, "never affirmatively expressed his neutrality"; what does matter is how militant groups perceived Hamdan's political affiliation—regardless of what he "affirmatively expressed"—and whether it was likely that they would harm him because of that perception. *See Nakibuka v. Gonzales*, 421 F.3d 473, 478 (7th Cir. 2005); *see also De Brenner v. Ashcroft*, 388 F.3d 629, 635-36 (8th Cir. 2004) (stating that inquiry must focus on whether persecutor, rightly or wrongly, attributes a political opinion to victim); *Vasquez v. INS*, 177 F.3d 62, 65 (1st Cir. 1999) (same); *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997) (same). In other words, the IJ completely misunderstood Hamdan's claim of future persecution based on imputed political opinion, a mistake that caused the IJ both to ignore Hamdan's actual argument and to favor irrelevant facts when denying Hamdan's request for relief. *See*

*Tolosa*, 384 F.3d at 910-11; *see also Lian v. Ashcroft*, 379 F.3d 457, 459 (7th Cir. 2004) (vacating and remanding claim for relief from removal when "most of" IJ's opinion was "taken up with irrelevancies").

All told, the IJ did not address Hamdan's claims that, upon his return to the West Bank, he would suffer economic persecution because of his Palestinian identity, and that Palestinian militant groups would harm him because of the political beliefs they imputed to him. *See Hengan*, 79 F.3d at 64 ("Agencies must respond to the arguments made to them . . . ."). We express no opinion as to the merits of Hamdan's claims. We remand only to allow the IJ the first opportunity to pass judgment on the claims it previously ignored. *See Salameda*, 70 F.3d at 451-52; *see also Binrashed*, 502 F.3d at 673; *Durgac v. Gonzales*, 430 F.3d 849, 851-52 (7th Cir. 2005) ("[P]etitions for review will be granted when the court concludes that there is more that must be done at the agency level . . . .").

### III. CONCLUSION

We GRANT Hamdan's petition for review, VACATE the BIA's final order of removal, and REMAND this case to the immigration courts for further proceedings.