# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-4039 & 04-1484

HUSAM F. HAMDAN,

*Petitioner,*

*v.*

ALBERTO GONZALES,[1] United
States Attorney General,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A76-678-463

ARGUED SEPTEMBER 22, 2004—DECIDED OCTOBER 13, 2005

Before COFFEY, WILLIAMS, and SYKES, *Circuit Judges.*

COFFEY, *Circuit Judge.* Plaintiff-Appellant Husam Fakhri Hamdan, a native of Kuwait and former resident of Jordan, petitions the court for review of two orders of the Board of Immigration Appeals ("BIA"), one affirming without opinion an immigration judge's decision to deny his application for adjustment of status and the other denying his motion to the BIA to reconsider its summary affirmance

---

[1] Pursuant to Federal Rule of Appellate Procedure 43(c), we have substituted Alberto Gonzales for John Ashcroft as the named respondent.

of the immigration judge's decision. In both petitions,[2] Hamdan requests that we review the BIA's use of its streamlining procedure to affirm the immigration judge's decision denying him relief and ordering his removal to Jordan. Hamdan argues that the immigration judge made a legal error in adjudicating his application and that the BIA erred in streamlining his appeal and affirming the judge's decision without issuing a written opinion explaining why it refused to correct the alleged errors. In a related argument, Hamdan also claims that aggressive questioning by the immigration judge during his adjustment of status hearing violated the Due Process Clause of the Fifth Amendment. For the following reasons, we deny Hamdan's consolidated petition.

## I. Background

Hamdan, a Palestinian born in Kuwait in 1966, initially entered the United States on a student visa in 1984 and then returned to Kuwait in 1985. In 1990, Hamdan, his parents, and his brother fled to Jordan. While in Jordan, Hamdan obtained a Jordanian passport and a United States non-immigrant visa, allowing him to travel from Jordan to the U.S. In December of 1993, Hamdan re-entered the U.S. on a subsequent student visa. He did not leave the U.S. upon the expiration of his visa in 1994. Rather, on September 12, 1997, Hamdan filed an application for asylum with the Immigration and Naturalization Service ("INS"),[3] seeking (1) political asylum, (2) withholding of removal, and

---

[2] On March 3, 2004, the Court consolidated the petitions for review.

[3] On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice and its functions were transferred to the newly-formed Department of Homeland Security.

(3) protection under the Convention Against Torture ("CAT").

## A. Hamdan's Asylum Application[4]

In his asylum application, Hamdan claimed to have been mistreated in Kuwait and Jordan because of his race, nationality, membership in a particular social group, and political opinion. In particular, Hamdan alleged that the Jordanian police beat him because he was a Palestinian who was critical of the Jordanian government's mistreatment of Palestinians and also because he was a member of a particular social group that was persecuted, namely, Palestinian refugees from Kuwait living in Jordan.

During his asylum hearing, he stated that he was a member of a political organization (which he did not identify by name) that held rallies to create an awareness of the mistreatment of Palestinians in Jordan. Hamdan alleged that he was detained by Jordanian authorities on five occasions in 1991 due to his membership in the unidentified group. Hamdan testified that during his first detention, Jordanian authorities interrogated him for three hours and "slapp[ed]" and "kick[ed]" him. He also claimed to have been beaten during his second detention.[5] He testified that his treatment was "less severe" during the

---

[4]  Hamdan has not petitioned this court for review of the immigration judge's decision to deny his application for asylum; thus, the merits of his asylum application are not before us. We recount the factual background of his asylum application solely to provide context for the immigration judge's decision to deny his application for adjustment of status.

[5]  Hamdan did not offer any objective evidence to support his claims of detention and physical abuse, and he did not provide any specific details about how he was "beaten."

other three detentions; however, he claimed that on those occasions the Jordanian officers threatened him with torture and warned him upon his release from detention that they would continue to "monitor[ ] [his] activities." Hamdan claimed that he left Jordan in 1993 for the U.S. because he feared further persecution from the Jordanian government. Hamdan also testified that he suffered from depression and paranoid schizophrenia. His attorney claimed that the medicals records demonstrated that his psychological disorders would cause him "to react to external stimulus in a fashion that is more severe than maybe other individuals would under the same circumstances . . . ." He argued that Hamdan's exaggerated response would be an injury to him "above and beyond the actual physical beatings."

On December 30, 1999, the immigration judge ("IJ") denied Hamdan's request for asylum, withholding of removal, and protection under the CAT. The IJ found that state department reports established that since the end of 1991, Palestinians living in Kuwait were no longer routinely assaulted by vigilante groups. As for Palestinians in Jordan, the judge assumed for the purposes of his analysis that Hamdan's testimony was credible and that Hamdan had in fact been mistreated while detained. Nonetheless, the judge concluded that the experiences Hamdan described did not constitute "past persecution." The judge credited Hamdan's testimony that he felt vulnerable in Jordan due to his depression and his subjective fear of persecution should he be forced to return to Jordan. However, the judge noted that Hamdan must also demonstrate an objective, well-founded fear of persecution in Jordan and, on this issue, he determined that Hamdan had failed. Finally, the judge adopted state department reports which opined, "It would be impossible to argue . . . that Palestinians are a persecuted majority in Jordan," and found that Palestinian refugees from Kuwait living

in Jordan were not members of a designated social group eligible for asylum.

Hamdan appealed the decision of the IJ to the BIA; however, before the Board issued a decision, Hamdan's mother was granted citizenship in the United States, making him immediately eligible to apply for adjustment of status to that of a permanent resident. *See* 8 U.S.C. § 1255(i)(1)(B). Because a successful application for adjustment of status would allow Hamdan to remain in the U.S. indefinitely and obviate any need for him to continue with his asylum application, he filed a motion with the BIA seeking a remand to the IJ which would allow him to apply for adjustment of status. *See id.* The BIA granted Hamdan's motion and remanded his case to the same IJ who had adjudicated his asylum application.

## B. Hamdan's Application for Adjustment of Status[6]

The IJ held a second hearing, this time on Hamdan's adjustment of status application, on December 21, 2001. At

---

[6] Applications for adjustment of status, a form of discretionary relief, are evaluated by immigration judges after receiving evidence and testimony concerning the "adverse factors" and countervailing "equities" present in a given application. *Elkins v. Moreno*, 435 U.S. 647, 667 (1978) (quoting *Matter of Arai*, 13 I. & N. Dec. 494, 496 (BIA 1970)). " 'Where adverse factors are present in a given application, it may be necessary for the applicant to offset these by a showing of unusual or even out-standing equities. Generally, favorable factors such as family ties, hardship, length of residence in the United States, etc., will be considered as countervailing factors meriting favorable exercise of administrative discretion. *In the absence of adverse factors, adjustment will ordinarily be granted*, still as a matter of discretion.' " *Id.* (emphasis in original) (quoting *Arai*, 13 I. & N. Dec. at 496).

the hearing, Hamdan testified that he entered the U.S. in 1993 on a student visa but did not attend the University of Wisconsin-Milwaukee as promised in his visa application. He explained that he had several family members legally residing in the U.S., that he had maintained sporadic periods of employment since his arrival in 1993, and that he had obtained an associate degree in Applied Science from the Milwaukee Area Technical College in 1999. In addition, Hamdan disclosed that he was under the care of a psychiatrist and had been diagnosed as suffering from paranoid schizophrenia. He testified that on one occasion his family called the police and had him hospitalized for seven weeks due to his mental illness. Although he was taking medication for his disorder, he testified that he was admitted to the hospital because his medication was ineffective, causing him to act out. When pressed on cross examination for more details on why he was hospitalized, Hamdan only reiterated that it was due to the inadequacy of his medication. He further revealed that, while hospitalized, he was arrested after he broke a window and attempted to escape.

On cross examination by the government, Hamdan declared that he had "no political affiliation at all," a statement which directly contravened his previous testimony at the asylum hearing when he claimed membership in an unidentified anti-Jordanian political organization. Hamdan also admitted that, when he entered the country on a student visa in 1993, he had no money and knew that his uncle did not intend to pay for his education.

Following the government's questioning of the petitioner, the IJ asked Hamdan some follow-up questions. He questioned him about the procurement of his second student visa in 1993, and Hamdan admitted that his "first priority" in obtaining the visa was to leave Jordan, not to attend school. The judge then asked if he was hospitalized after his first arrival in the U.S. in 1984. After

Hamdan said that he had not been hospitalized, the judge asked if he recalled testifying during his December of 1999 hearing that he had been hospitalized during his initial visit. In response, Hamdan changed his previous answer and acknowledged that he had been hospitalized for seven to ten days in 1984, shortly after his first entry into the U.S., because he had experienced hallucinations.

Next, the IJ asked Hamdan to explain the inconsistency between his position at the asylum hearing that he was detained because he criticized the political situation in Jordan and his testimony during the adjustment of status hearing that he had no political opinion. During his asylum hearing, Hamdan repeatedly claimed he was persecuted on account of his political opinion. Then, on direct examination at his adjustment of status hearing, Hamdan's attorney had asked, "[D]o you have any type of membership in or any connection with any kinds of organizations?" Hamdan replied, "I have no political affiliation at all."[7] Following his direct and cross examinations, the judge asked Hamdan to clarify his statement that he had no political affiliation, inquiring, "[S]o are you saying that you never in any way opposed the Jordanian government when you lived in Jordan prior to 1993?" In response, Hamdan stated, "I did not oppose, no. I just was objecting—used to object to the internal conditions in Jordan—[ ]living conditions, unemployment, taxes imposed, and this has nothing to do with politics."[8] The judge reminded Hamdan of his testimony at

---

[7]  The record is unclear as to whether Hamdan meant he presently had no political affiliation or whether he meant he had never had any political affiliation.

[8]  On one hand, Hamdan claimed political persecution at the hand of the Jordanian government; on the other, he claimed that he has no political affiliation at all. The IJ's follow-up questions were undoubtedly an attempt to elicit an explanation for the contradic-

(continued...)

his asylum hearing that he was mistreated by Jordanian authorities because of his political opinion, but Hamdan denied making this prior statement and explained, "I wasn't talking about the politics—political situation. I was talking about the economic situation, but sometimes politics and the economy intertwine." He went on to testify: "I wasn't talking about political situation in Jordan, only about the internal situation in Jordan because we were supposed to receive assistance. We didn't get the assistance and things like these, but I don't criticize the government of Jordan." After this disconcerting line of questioning, the judge concluded his inquiry and continued the hearing to receive more information from Hamdan regarding his psychiatric history, diagnosis, and progress.

On March 22, 2002, the IJ denied Hamdan's request for adjustment of status. The judge found that Hamdan's relationship with his U.S. citizen mother and other family members as well as his having obtained an associate degree favored the relief sought. Despite these factors in Hamdan's favor, he ultimately concluded that Hamdan's application presented significantly more "adverse factors" that outweighed the equitable considerations. The judge noted Hamdan's mental health history as a matter of concern, especially given his lengthy hospitalization and recent arrest. He also determined that Hamdan had engaged in a "clear pattern of immigration abuse" in obtaining a student visa without any intention of actually initiating or completing a program of study at the university where he promised immigration authorities he would enroll. In addition, the judge expressed his view that, in light of the testimony Hamdan had given at his adjustment hearing, his 1997 claim for asylum now appeared suspect and might have

---

[8] (...continued)

tory statements, but Hamdan's answers only further confounded his testimony.

been filed for the sole purpose of delaying his removal proceedings until he became eligible to adjust his status. In support of this view, the judge noted his earlier finding that Hamdan failed to offer any objective evidence at his asylum hearing to support his application. The judge also pointed out the contradiction between Hamdan's position at the asylum hearing that he was politically active in opposing the Jordanian government's treatment of Kuwaiti Palestinians and his statement at the adjustment of status hearing denying that he had any political affiliation or opinion that opposed the Jordanian government. The IJ stated that although Hamdan may not have fabricated his testimony at the asylum hearing, his 1997 asylum application now appeared to be frivolous "in the sense that it had no merit and was not intended really to obtain political asylum but rather to enable the respondent to stay in the United States until his mother was naturalized." The judge determined, based on the testimony presented at the adjustment of status hearing, that when Hamdan left Jordan "he was not fleeing persecution of any kind [but] was simply engaging in a very common practice of using deception to obtain a visa for an alleged purpose which he had no intention of complying with." Finding that Hamdan's "presence in the United States since 1993 is almost entirely based on deception," the IJ denied Hamdan's application for adjustment of status in the exercise of discretion, denied his request for voluntary departure, and ordered that he be removed to Jordan.

Hamdan appealed the decision to the BIA, and on October 23, 2003, the BIA affirmed without opinion the IJ's decision, making the IJ's decision the final agency determination. *See* 8 C.F.R. § 1003.1(e)(4). On November 24, 2003, Hamdan filed a petition for review with this court as well as a motion to reconsider with the BIA. *See* 8 C.F.R. § 1003.2(b). In his motion to reconsider, Hamdan argued that (1) the BIA should not have used its streamlining rule to dispose of his

appeal,[9] (2) the IJ violated the principle of *res judicata* when, after finding Hamdan's testimony at his asylum hearing credible for the purposes of that analysis, he determined at his adjustment of status hearing that Hamdan's asylum application had been frivolous, and (3) the IJ violated his due process rights by aggressively questioning Hamdan during the adjustment of status hearing. On February 24, 2004, the BIA denied the motion to reconsider in a *per curiam* order, finding that no error of fact or law existed in its earlier decision. On March 1, 2004, Hamdan filed a second petition for review of the BIA's decision, and on March 3, 2004, we consolidated the petitions for review.

## II. Analysis

In his petition, Hamdan argues that the BIA improperly employed its streamlining regulation to affirm the IJ's decision to deny his application for adjustment of status.[10] Next, he argues that the IJ violated the principle of *res judicata* by crediting Hamdan's testimony at the asylum hearing and then later finding, after the adjustment of status hearing, that Hamdan engaged in a pattern of immigration abuse. Finally, he contends that the IJ violated his right to a fair hearing as guaranteed by the Fifth Amendment's Due Process Clause when questioning him at the adjustment of status hearing. Before proceeding to the

---

[9] As discussed in more detail in the court's analysis, the BIA's streamlining regulation authorizes a single BIA member to affirm an immigration judge's decision without issuing an opinion if a Board member determines that certain conditions are met. *See* 8 C.F.R. § 1003.1(e)(4)(i).

[10] Hamdan does not challenge the validity or constitutionality of the BIA's streamlining rule nor the BIA's discretion to use the rule as permitted by the guidelines.

merits of Hamdan's petition, we address our jurisdiction to entertain his petition for review.

Until recently, we would have dismissed Hamdan's petition for lack of jurisdiction; however, the relevant law has changed due to the enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231. Review of Hamdan's petition continues to be governed by 8 U.S.C. § 1252(a)(2)(B), which prohibits appellate courts from reviewing "(i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this [subchapter] to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title."[11] However, Section 106(a)(1)(A)(iii) of the REAL ID Act, enacted on May 11, 2005, qualifies the jurisdiction-stripping provision found in § 1252(a)(2)(B) with the enactment of a new provision, § 1252(a)(2)(D), which reads as follows:

> Judicial Review of Certain Legal Claims—Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

8 U.S.C. § 1252(a)(2)(D). With this amendment, Congress restored limited judicial review of constitutional claims and questions of law presented in petitions for review of final removal orders. Furthermore, in the REAL ID Act, Con-

---

[11] Section 1255, which is one of the sections included in part (i), governs requests for adjustment of status. 8 U.S.C. § 1255.

gress explicitly mandated that the amendment restoring our jurisdiction be retroactive. *Fernandez-Ruiz v. Gonzales*, 410 F.3d 585, 587 (9th Cir. 2005); *see also Ramos v. Gonzales*, 414 F.3d 800, 801-02 (7th Cir. 2005). Specifically, the Act declares that § 1252(a)(2)(D) "shall take effect upon the date of the enactment of this division and shall apply to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of the enactment." REAL ID Act § 106(b). Thus § 1252(a)(2)(D), as added by the REAL ID Act, retroactively applies to Hamdan's petition. Accordingly, we have now been vested with jurisdiction to review the constitutional claims and questions of law presented in Hamdan's petition.

## A.  The BIA's Use of the Streamlining Procedure

Before we address the legal and constitutional questions presented by Hamdan's petition—specifically, whether the IJ violated the principle of *res judicata* or Hamdan's due process rights—we briefly address his challenge to the procedural posture of this case. Hamdan argues that his appeal was not appropriate for single-member review and summary affirmance by the BIA since the IJ made a legal error in denying his application for adjustment of status. He further contends that this alleged legal error required correction by the BIA and that the BIA should have reviewed his case utilizing a three member panel instead of summarily affirming the IJ's decision without issuing an opinion.

Although an IJ's decision is ordinarily reviewed by a three member panel, the BIA's streamlining regulation authorizes a single BIA member to affirm the judge's decision without opinion if the following conditions are met:

> [T]he Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were

> harmless or nonmaterial; and that (A) [t]he issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel fact situation; or (B) [t]he factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case.

8 C.F.R. § 1003.1(e)(4)(i).[12] "If a case is streamlined, the IJ's decision becomes that of the BIA for purposes of judicial review." *Georgis v. Ashcroft*, 328 F.3d 962, 966-67 (7th Cir. 2003).[13] Thus, while courts are to review "only the final determinations of the BIA," the practical effect is that when the BIA streamlines an appeal, a court reviews the IJ's decision. *See Morales-Morales v. Ashcroft*, 384 F.3d 418, 423 (7th Cir. 2004).

The Department of Homeland Security, relying on the Eighth Circuit's recent decision in *Ngure v. Ashcroft*, 367 F.3d 975, 983 (8th Cir. 2004), argues that the BIA's decision to streamline is *never* subject to judicial review because that decision is committed to the absolute discretion of the agency and therefore unreviewable under the Administrative Procedures Act ("APA"). *See also Heckler v. Chaney*, 470 U.S. 821, 837-38 (1985). Several courts of appeals have arrived at different conclusions on this issue

---

[12] If an individual BIA member streamlines his review of a case, the Board issues a form order containing the following language: "The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination." 8 C.F.R. § 1003.1(e)(4)(ii).

[13] A decision to streamline "does not mean that the BIA has adopted, or entirely approves of, the IJ's determinations; it only means that the BIA deemed any errors by the IJ to be harmless." *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir. 2003); *see* 8 C.F.R. §1003.1(e)(4)(ii).

and related issues. *Compare Smriko v. Ashcroft*, 387 F.3d 279, 294 (3d Cir. 2004) (holding that the BIA's streamlining decisions are reviewable), *Chen v. Ashcroft*, 378 F.3d 1081, 1088 (9th Cir. 2004), *Haoud v. Ashcroft*, 350 F.3d 201, 206 (1st Cir. 2003), *and Falcon Carriche*, 350 F.3d at 852-53, *with Tsegay v. Ashcroft*, 386 F.3d 1347, 1356 (10th Cir. 2004) (holding that decisions under § 1003.1(e)(4)(i) of the streamlining provisions are unreviewable), *and Ngure*, 367 F.3d at 983. However, we need not address this issue. This is not a case where the BIA's decision to streamline "impact[s]" or "distort[s]" the exercise of our "judicial review function." *Smriko*, 387 F.3d at 296. As explained, we generally need not review the BIA's decision to streamline, for we review the IJ's decision directly when we have jurisdiction to do so, in which case "it makes no practical difference whether the BIA properly or improperly streamlined review . . . ." *Georgis*, 328 F.3d at 967. In this instance, we have limited jurisdiction to review the IJ's discretionary decision regarding adjustment of status; thus, it makes no practical difference whether the BIA properly or improperly streamlined review. Accordingly, we now turn our attention to Hamdan's challenges to the IJ's decision to deny him adjustment of status.

## B.  Hamdan's Request for Adjustment of Status

Hamdan's primary argument is that the IJ violated the principle of *res judicata* by "revisiting" his asylum application at the adjustment of status hearing.[14] In the opin

---

[14] Hamdan also raises two additional arguments in his brief: (1) that the IJ violated an agency rule by stating that his asylum application was frivolous without specifically finding that he had presented fabricated testimony, *see* 8 C.F.R. § 208.20; and (2) that the IJ's belief that he provided contradictory testimony concerning
(continued...)

ion denying Hamdan's request for adjustment of status, the IJ commented on Hamdan's asylum application, stating that Hamdan's "application [for asylum] is frivolous, frivolous in the sense it had no merit and was not intended really to obtain political asylum but rather to enable the respondent to stay in the United States until his mother was naturalized." Hamdan claims that this pronouncement exceeds the IJ's mandate on remand. He argues that because the IJ did not previously determine that his asylum application was frivolous, his decision on Hamdan's request for adjustment of status indicates that the IJ revisited previous facts that had already been established.

The doctrine of *res judicata* proclaims that "a valid and final judgment precludes a second suit between the same parties on the same claim or any part thereof." *Medina v. INS*, 993 F.2d 499, 503 (5th Cir. 1993); *see also Dye v. U.S. Farm Servs. Agency*, 129 Fed. Appx. 320, 322 (7th Cir. 2005) ("*Res judicata* bars suits where there is a final judgment on the merits; an identity of the issues of the lawsuit; and an identity of the parties or their privies."). *Res judicata* (as well as the related principle of collateral estoppel) applies to administrative proceedings such as the adjudication of petitions for relief in immigration courts. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107-08 (1991); *Santana-Albarran v. Ashcroft*, 393 F.3d 699, 704 (6th Cir. 2005); *Johnson v. Ashcroft*, 378 F.3d 164,

---

[14] (...continued)

his political beliefs was misplaced because he sought asylum based on an imputed political opinion rather than because he actually held a political opinion, *see Lwin v. INS*, 144 F.3d 505 (7th Cir. 1998). The record reveals that Hamdan failed to present these arguments to the BIA and has thus failed to exhaust his administrative remedies with respect to these issues. Accordingly, we lack jurisdiction to consider either contention in our analysis. *Awad v. Ashcroft*, 328 F.3d 336, 340 (7th Cir. 2003).

172 n.10 (2d Cir. 2004); *Matter of Barragan-Garibay*, 15 I. & N. Dec. 77, 78-79 (BIA 1974). Indeed, "[w]hen an adminis- trative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *Astoria Fed. Sav. & Loan Ass'n*, 501 U.S. at 107 (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)). Although *res judicata* does apply to immigra- tion proceedings, the concept has no role to play in any proceeding until a final judgment has been reached on an issue. *Medina*, 993 F.2d at 503; *see also Tittjung v. Reno*, 199 F.3d 393, 397 n.2 (7th Cir. 1999).[15]

Despite the myriad of problems that exist with Hamdan's *res judicata* argument, *see supra* footnote 15, we need not resolve the issue of whether the IJ violated the principle of

---

[15] In Hamdan's case, the question arises whether a final judgment was reached on his asylum claim. After the IJ issued his decision denying Hamdan's application for asylum, Hamdan sought review of his case with the BIA. However, before the BIA could address his appeal and issue a decision, Hamdan requested and received a remand to the IJ. Arguably, since the BIA never had the opportunity to review the IJ's decision on his asylum application, the decision was never "final" in the sense that *res judicata* is even applicable. *See Abdulai v. Ashcroft*, 239 F.3d 542, 548-49 (3rd Cir. 2001) ("Because an alien facing removal may appeal to the BIA as of right, and because the BIA has the power to conduct a *de novo* review of IJ decisions, there is no 'final order' until the BIA acts."); *see also Castillo-Rodriguez v. INS*, 929 F.2d 181, 183 (5th Cir. 1991) ("The order of the immigration judge . . . is not final when a timely appeal is taken to the Board."). Even assum- ing the decision was final, the decision was to deny his application for asylum, a decision that the IJ did not modify in the separate adjustment of status decision. Rather, he merely illustrated the suspect timing of the asylum application as it related to Hamdan's request for adjustment of status.

*res judicata.* Even if we were to determine that the IJ's decision on Hamdan's asylum application was final and, going one step further, that the judge had violated the principle of *res judicata* by revisiting Hamdan's asylum application and questioning Hamdan's credibility during the adjustment of status hearing, the record reveals that the IJ articulated sufficient reasons apart from the suspect nature of Hamdan's asylum application to justify denying him adjustment of status. We have previously held that overt abuse of immigration laws alone is a sufficient reason to deny an alien discretionary relief. *See, e.g.*, *Elkins v. Moreno*, 435 U.S. 647, 668 (1978); *Garcia-Lopez v. INS*, 923 F.2d 72, 76 (7th Cir. 1991); *Achacoso-Sanchez v. INS*, 779 F.2d 1260, 1262 (7th Cir. 1985); *Patel v. INS*, 738 F.2d 239, 242 (7th Cir. 1984). We have also found that the "[a]bsence of good faith entry is considered a critical adverse factor in an application for adjustment of status" and that "[t]his factor alone may be sufficient to deny adjustment to permanent resident status." *Patel*, 738 F.2d at 242; *see also Elkins*, 435 U.S. at 668 (finding that among the adverse factors considered as militating against the granting of adjustment are "such things as entering the United States under fraudulent circumstances"). Furthermore, "[i]f a sufficient reason for the exercise of discretion to deny an application exists, any ill-advised reason for the denial may be disregarded as mere surplusage." *Patel*, 738 F.2d at 243.

Beyond noting that Hamdan's asylum application seemed suspect based on his testimony at the adjustment of status hearing, the IJ also set forth additional grounds for denying Hamdan's request for adjustment of status. Specifically, the judge highlighted Hamdan's abuse of immigration laws when he obtained a student visa without intending to study at the designated university (as he had represented to the immigration authorities), his failure to attend the university previously designated once he arrived in the U.S, and his failure to return to Jordan as required when his student visa expired. The IJ noted that this was not Hamdan's first

deception, as he had entered the U.S. in 1984 allegedly to study but did not, returning to Kuwait after only a brief stay. The IJ also mentioned Hamdan's recent hospitalization to treat his mental illness as well as his subsequent arrest and stated that he would consider these matters in determining Hamdan's "worthiness" for the relief sought. All of these additional reasons set forth by the IJ in his decision clearly manifested themselves during the adjustment of status hearing and provided sufficient reason for the IJ, in his discretion, to deny Hamdan's request. Because the IJ has supplied additional reasons for denying Hamdan adjustment of status beyond his comments regarding Hamdan's "frivolous" asylum application, any alleged violation of the principle of *res judicata* by the IJ would be harmless.

Hamdan's only remaining argument is that the IJ violated his right to due process by aggressively questioning him at his adjustment of status hearing. The Fifth Amendment entitles aliens to due process in immigration proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993). Furthermore, in extreme cases, an overly aggressive IJ can dominate the proceedings so as to prevent an alien from effectively presenting his case. *See Podio v. INS*, 153 F.3d 506, 509 (7th Cir. 1998). However, in order to make a valid due process claim, "a claimant must have a liberty or property interest in the outcome of the proceedings." *Dave v. Ashcroft*, 363 F.3d 649, 653 (7th Cir. 2004). As we have previously ruled, "in immigration proceedings, a petitioner has no liberty or property interest in obtaining purely discretionary relief . . . ." *Id.* Thus, an alien's right to due process does not extend to proceedings that provide only discretionary relief, and the denial of such relief does not violate due process. *Id.*; *see also Dandan v. Ashcroft*, 339 F.3d 567, 575 (7th Cir. 2003) ("[T]he decision when to commence deportation proceedings is within the discretion of the Attorney General and does not, therefore, involve a

protected property or liberty interest . . . . As such, Dandan's due process argument does not get off the ground."); *Nativi-Gomez v. Ashcroft*, 344 F.3d 805, 808 (8th Cir. 2003); *Aguilera v. Kirkpatrick*, 241 F.3d 1286, 1292-93 (10th Cir. 2001); *Huicochea-Gomez v. INS*, 237 F.3d 696, 700 (6th Cir. 2001); *Appiah v. INS*, 202 F.3d 704, 709 (4th Cir. 2000); *Mejia Rodriguez v. Reno*, 178 F.3d 1139, 1146-48 (11th Cir. 1999). This reasoning has been applied to cancellation of removal cases, *see Dave*, 363 F.3d at 653, claims of ineffective assistance of counsel, *see Nativi-Gomez*, 344 F.3d at 808, and claims that the BIA inappropriately streamlined an appeal despite an IJ's use of an inappropriate legal standard, *see Garcia v. Att'y Gen. of the U.S.*, 329 F.3d 1217, 1222-23 (11th Cir. 2003). Because adjustment of status is also a form of discretionary relief, *see Achacoso-Sanchez*, 779 F.2d at 1262-63, Hamdan's due process challenge to the BIA's denial of his request for adjustment of status fails, *see Garcia*, 329 F.3d at 1222 ("[W]here a constitutional claim has no merit, the Court does not have jurisdiction.").

## III.  Conclusion

Accordingly, we DENY Hamdan's petition for review.

A true Copy:

       Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
