In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2570

FERDINANT MEMA,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A79-442-784

ARGUED FEBRUARY 21, 2006—DECIDED JANUARY 11, 2007

Before BAUER, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* An immigration judge granted
Spartak Mema political asylum in January 2002, and now
his identical twin brother Ferdinant seeks that same
protection. Ferdinant Mema (Ferdinant)[1], a native and
citizen of Albania, was detained at Fort Lauderdale Inter-
national Airport when he tried to enter this country
with an illegitimate Italian passport. He seeks asylum
claiming that he suffered persecution at the hands of

---

[1] We refer to the asylum applicant by his first name to distin-
guish him from the other members of his family whose experi-
ences figure prominently in Ferdinant's claim.

Albanian authorities in retaliation for his and his family's association with the Democratic Party in Albania. After a hearing, an immigration judge denied Ferdinant asylum and withholding of removal, and the Board of Immigration Appeals (BIA) affirmed. We remand for consideration of relevant, probative evidence central to Ferdinant's claim that the immigration judge failed to consider the first time around.

Ferdinant, born in 1982, lived in Albania with his parents, his identical twin brother Spartak, his older brother Edmond, and Edmond's wife Suela. Edmond, Spartak, and Suela all fled Albania—Edmond in 1997, and the others in 1999—and later received asylum in this country based on the persecution they suffered as members of the Democratic Party of Albania and children of an activist leader with that Party. Ferdinant, on the other hand, left Albania for Greece in 1997, and lived there, without permission, doing a variety of odd jobs, before returning to Albania in 1999 and finally fleeing to this country in 2002.

At his hearing before the immigration judge, Ferdinant testified that his family members had been subject to persecution at the hands of government authorities in retaliation for their membership and participation in the Democratic Party in Albania and specifically, as retribution for activist and leadership roles assumed by Sabri Mema, Ferdinant's father.

In his supplement to his application for asylum, Ferdinant recalls several instances in which family members were singled out and harassed based on an affiliation with the Democratic Party or their relationship to Sabri Mema. For example, Ferdinant described an incident in 1998 when his identical twin brother Spartak was stopped by police officers on his way to a Democratic Party meeting. The officers detained Spartak for five or

six hours, beat him and threatened him. Just a few weeks later, Sabri had a run-in with Socialist authorities while working as a poll watcher in an important election. After reporting voting irregularities, Sabri was detained, instructed to remain silent, and threatened with unspecified consequences. In defiance of the threats, Sabri reported his experiences to the Democratic Party which later filed a suit challenging the results of the election. Sabri received a summons to appear in court for the trial, but when he appeared the matter had been continued. According to Ferdinant, members of the Socialist Party had manipulated the court dates to garner time to strong-arm those who might testify against the Party in the suit. Indeed, Ferdinant explained, two days after his father, Sabri, was scheduled to testify, Albanian police arrested Sabri and brought him to the police station where officers issued threats in an attempt to influence his testimony.

Three weeks later, Spartak received a subpoena to appear at the prosecutor's office. When he arrived, he was detained, beaten, and told he would be prosecuted unless he convinced his father to alter his anticipated testimony. Spartak received a second subpoena the following month and again appeared at the prosecutor's office where officials accused him of giving false testimony on the earlier occasion. Again, officials beat him, threatened him, and accused him of disrupting the referendum vote.

Ferdinant's supplemental application also describes the events that pushed Spartak and Suela to flee for their safety. On April 23, 1999, Spartak received a summons to appear as a defendant in a criminal proceeding initiated by the Ministry of Internal Affairs. While Spartak awaited his court appearance, Sulea Mema, Ferdinant and Spartak's sister-in-law, also received a subpoena to appear at the prosecutor's office. Once there, Suela refused orders to sign a document denouncing her father-in-law as

a liar and troublemaker. Despite threats of criminal prosecution, Suela held firm. Although she was released on that day, a few days later, on May 10, 1999, she was arrested and taken to the prosecutor's office where officials again ordered her to sign the papers. When she refused, she was attacked, beaten, and raped.

Ferdinant, who had recently returned from Greece, went with the rest of his family to a hospital in Tirana to seek treatment for Suela. While the family was away, Albanian police destroyed the Mema home. In response to these events, the family decided that Spartak and Suela had to leave Albania. On May 19, 1999, the two left Albania, leaving Ferdinant behind to stay with their parents. Ferdinant went to stay with relatives to avoid further trouble, but Sabri's troubles continued, and it was not long before police arrested him again after speaking at a rally. This time they held him for four days.

The bulk of Ferdinant's claim of past persecution centers on the events of June 20, 2001. Ferdinant testified that on that day five masked police officers forced him into a car at gunpoint, took him to an abandoned house, and asked him why he had come back to cause trouble. According to Ferdinant, the officers repeatedly referred to him by his twin brother, Spartak's, name. When Ferdinant insisted that he was not Spartak the officers beat him. The masked men demanded that Ferdinant gather information about his father and other Democratic Party supporters and told Ferdinant to warn his father that if Sabri interfered with voting, Ferdinant would pay the price. After this, they continued to beat Ferdinant until he passed out.

Two days after the attack, Ferdinant testified, his father described his family's suffering at a pro-democratic rally. The following day, the family received word that the police were looking for Ferdinant. That news sent

Ferdinant and his mother into hiding in a small town in Northern Albania. Ferdinant's father continued with his activities and even decided to run for office in the local elections, but changed his mind after March 10, 2002, when he was approached by several officers who had a warrant for Ferdinant's arrest. Meanwhile, Ferdinant and his mother, having been tipped off that the police had come looking for Ferdinant, moved to yet another small town until Ferdinant was able to secure passage out of Albania on May 25, 2002. He arrived at Fort Lauderdale International Airport on May 31, 2002.

After a hearing on November 20, 2002, the immigration judge issued an order denying Ferdinant's applications and ordering his removal to Albania. The BIA adopted and affirmed the decision of the immigration judge adding a few sentences describing why the immigration judge's credibility determination was supported by the record and noting that Ferdinant received due process of law. (R. at 2-3). Where the BIA affirms, adopts, and supplements, we review both the immigration judge's decision and any additional reasoning of the BIA. *Giday v. Gonzales,* 434 F.3d 543, 547 (7th Cir. 2006). We must affirm the immigration judge's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole, and overturn it only if the record compels a contrary result. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992); *Balliu v. Gonzales*, 467 F.3d 609, 612 (7th Cir. 2006).

In evaluating whether the record compels a contrary result, we must first determine how much attention to give to the accounts of the Mema family's struggles in Albania. Although Ferdinant's own participation in the Democratic party was not extensive, if his testimony is to be believed (more on that later), his father was an active and vocal agitator in the Democratic party, and his family suffered persecution at the hands of the Socialists as a

result. On the one hand, our asylum laws ordinarily do not extend protection to persons merely because a family member has suffered persecution. *Mabasa v. Gonzales*, 455 F.3d 740, 746 (7th Cir. 2006); *Tamas-Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir. 2000). On the other hand, asylum *is* available to persons who have been persecuted based on imputed political opinion, including situations where a persecutor attributes the political opinion of one or more family members to the asylum applicant. *See, e.g., Nakibuka v. Gonzales,* 421 F.3d 473, 478 (7th Cir. 2005); *Tolosa v. Ashcroft*, 384 F.3d 906, 910 (7th Cir. 2004); *Ciorba v. Ashcroft*, 323 F.3d 539, 542, 545 (7th Cir. 2003); *Iliev v. INS*, 127 F.3d 638, 642 (7th Cir. 1997). To succeed on a claim of imputed political opinion, an applicant must show that her persecutors attributed a political opinion to her, *Lwin v. INS*, 144 F.3d 505, 509 (7th Cir. 1998) and that this attributed opinion was the motive for the persecution. *See Elias-Zacarias*, 502 U.S. at 482-83. Sometimes this situation is described as persecution based on membership in a social group—i.e. the family group— but in either case the necessary proof is the same. *Iliev,* 127 F.3d at 642. Examples of persecution based on family membership abound in this circuit's case law. *See, e.g.*, *Nakibuka v. Gonzales*, 421 F.3d 473, 478 (7th Cir. 2005) (applicant repeatedly beaten because she was the maid and "part of the family" of a vocal opponent of the Ugandan President); *Niam v. Ashcroft*, 354 F.3d 652, 656-57 (7th Cir. 2004) (applicant beaten and persecuted because of his family's anti-communist reputation); *Tolosa*, 384 F.3d at 910 (government officials questioning implied that they imputed political beliefs of the father to his daughter); *Ciorba*, 323 F.3d at 545 (applicant was harassed—but not persecuted—based on family's anti-communist politics); *Lwin*, 144 F.3d at 509-10, 512-13 (agreeing that parents of political dissidents can seek asylum but only if the child's political opinion has been imputed to them

and they can otherwise demonstrate past or fear of future persecution because of it); *Iliev*, 127 F.3d at 642 (applicant from family of pro-democracy activists failed to demonstrate that he would be singled out for persecution based on his membership in the family); *Najafi v. INS*, 104 F.3d 943, 945, 947 (7th Cir. 1997) (fear of future persecution due to family association only supported where applicant can demonstrate potential for mistreatment because of a blood tie to the political dissidents).

Oft times persecutors target children of political dissidents not because they have imputed the parents' political opinion to the children, but as a means of harassing, intimidating, and influencing the behavior of the parent. *See Djouma v. Gonzales*, 429 F.3d 685, 688 (7th Cir. 2005) (noting that family members of activists are eligible for asylum if the government has persecuted that family member as a method of collective punishment of its political enemies). *See also, Cecaj v. Gonzales*, 440 F.3d 897, 898 (7th Cir. 2006) (dissident's brother kidnapped as a means to force the dissident to abandon his political activities); *Gjerazi v. Gonzales,* 435 F.3d 800, 803 (7th Cir. 2006) (kidnappers conditioned the release of the child of anti-socialist activist on the Socialist Party winning the vote in town in which applicant worked at the polling station).

According to Ferdinant's testimony, the Albanian authorities targeted Ferdinant and his siblings in an attempt to influence Sabri to withdraw his support for and participation in the Democratic party. If Ferdinant was or will be persecuted because of his relationship to Sabri, either because the Socialists imputed Sabri's political opinions to Ferdinant, or as a means of punishing or

influencing Sabri, Ferdinant is entitled to asylum.[2] The problem for Ferdinant, however, is that the immigration judge believed that Ferdinant had enhanced his description of his sole claim of personal persecution, the June 20, 2001 detention and beating, and that the unenhanced version would not suffice for a finding of past persecution. (R. at 55-56). We must view this determination with deference. *Diallo v. Ashcroft*, 381 F.3d 687, 698 (7th Cir. 2004) (credibility determinations are factual determinations owed our strong deference). In the alternative, the immigration judge determined that even if the enhanced version were true, the single case of detention and beating was insufficient to warrant a finding of past persecution. (R. at 53). Although another judge may have found that such an abduction at gunpoint, detention, and beating constitute past persecution, we cannot say that the record compels a contrary result. *Elias-Zacarias*, 502 U.S. at 481; *Bejko v. Gonzales*, 468 F.3d 482, 485 (7th Cir. 2006) ("we do not hold here that the described confinement and threats are insufficient to constitute past persecution as a matter of law. Instead, the only question before this court is whether the immigration judge was compelled to find that such confinement constituted past persecution.").

A finding of past persecution, however, is not Ferdinant's only avenue to asylum. He may also demonstrate that he has a well-founded fear of future persecution on the basis of his race, religion, nationality, membership in a social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A);

---

[2] Of course, if Ferdinant demonstrates that he has been persecuted in the past, the court must presume that he has a well-founded fear of future persecution. The government may then establish, by a preponderance of the evidence, that the conditions in the petitioner's homeland have improved such that persecution of the petitioner is unlikely to recur. *Balliu*, 467 F.3d at 612; 8 C.F.R. § 208.13(b)(1).

8 U.S.C. § 1158(b)(1)(B)(i); *Balliu*, 467 F.3d at 612. To do so he need not prove that the situation he describes in Albania will probably result in persecution, only that persecution is a reasonable possibility. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987) ("There is simply no room in the United Nations' definition for concluding that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no 'well-founded fear' of the event happening.") An applicant seeking to demonstrate a well-founded fear of future persecution must prove first that he has a subjectively genuine fear of future persecution, *Ahmed v. Ashcroft*, 348 F.3d 611, 618 (7th Cir. 2003), and then that a reasonable person in his situation would fear persecution if forced to return to his native country. *Kllokoqi*, 439 F.3d at 345.

These standards for establishing fear of future persecution are entirely absent from the immigration judge's decision. That decision largely glosses over the issue of fear of future persecution, concluding early on and without explanation that "even if the respondent's facts are true, the incident in June of 2001 does not rise to the level of past persecution and the respondent has not established that a reasonable person in his circumstances would fear future persecution within the meaning of Section 208 of the Act." (R. at 53). To the extent there is any explanation of this conclusion it comes toward the end of the decision when the immigration judge provides two skeletal rationales for his conclusion that Ferdinant does not face a well-founded fear of future persecution. The first is that Ferdinant remained in Albania for almost a year after the incident for which he claims past persecution. (R. at 58). The second is that he was able to obtain a valid passport and to leave without difficulty. *Id.* The relevance of these facts to Ferdinant's fear of future persecution is sketchy at best, but more importantly, it wholly ignores the evidence that is relevant to his fear of future persecution.

Although it is true that Ferdinant lived unmolested in Northern Albania as the immigration judge notes, Ferdinant fled his home village for Tirane, a village eight hours away, to avoid the persecution that his brother and sister-in-law had suffered. (R. at 90-91). It was when he returned that he was abducted, detained and beaten. (R. at 92-93, 170-71). Shortly after that incident, Ferdinant fled to yet another village, (R. at 106-07), but was able to stay there only until he got word that the police had come looking for him. (R. at 109-10).

Ferdinant does not have a well-founded fear of persecution if he can avoid persecution by relocating to another part of the country, *Ahmed v. Gonzales*, 467 F.3d 669, 675 (7th Cir. 2006); 8 C.F.R. § 208.13(b)(2)(ii), but we cannot require him to live in hiding. *See Giday v. Gonzales*, 434 F.3d 543, 555 (7th Cir. 2006). The immigration judge held that he did not find it plausible or credible that Ferdinant was sought by police while in hiding, but he offers not a single reason for this adverse credibility finding. Although we accord substantial deference to an immigration judge's credibility determinations, we cannot defer to a credibility determination unmoored from the record, based on insufficient evidence or "based on nothing but the immigration judge's personal speculation or conjecture." *Giday*, 434 F.3d at 550. Credibility findings must be based on "specific cogent reasons that bear a legitimate nexus to the finding and that go the heart of the applicant's claim." *Id.* We reject the immigration judge's credibility determination on this particular fact as lacking any reason whatsoever—cogent, specific, or otherwise.

The immigration judge's second rational—that Ferdinant was able to obtain an Albanian passport and leave the country—simply is not probative of his fear of future persecution. We have pointed out on several occasions that governments are often all too happy to see undesir-

ables and dissidents depart. *Durgac v. Gonzales,* 430 F.3d 849, 852 (7th Cir. 2005); *Grupee v. Gonzales*, 400 F.3d 1026, 1027 (7th Cir. 2005); *Hengan v. INS*, 79 F.3d 60, 63 (7th Cir. 1996); *Angoucheva v. INS*, 106 F.3d 781, 791 (7th Cir. 1997) (Rovner, J., concurring); *but see Dobrota v. INS,* 195 F.3d 970, 974 (7th Cir. 1999).

More importantly, however, the immigration judge failed to mention even once, either at the hearing or in his decision, the most pressing piece of evidence regarding fear of future persecution: Ferdinant was persecuted because the persecuting authorities believed he was his identical twin brother, Spartak, and thus they imputed Spartak's political opinions and activities to Ferdinant. Accordingly, in this case of mistaken identity, whether Ferdinant can reasonably fear persecution if forced to return to Albania depends upon whether Spartak could reasonably fear persecution if returned to Albania—a question to which the immigration judge never turned.

The immigration judge mentions, in passing, that Ferdinant had an identical twin brother who had been granted asylum, but never refers to any of the evidence that Ferdinant submitted regarding Spartak's fear of future persecution or the possibility that those persecuting Spartak would be just as likely to come after Ferdinant. In fact, despite the fact that Spartak and Suela were just outside the courtroom door waiting to testify, the judge instead chose to accept the statements submitted on their asylum applications in lieu of hearing their testimony. (R. at 133). A finding that Ferdinant has failed to establish a well-founded fear of future persecution ignores the most significant piece of evidence relating to the question and is thus a finding unsupported by the record. *See Gjerazi v. Gonzales*, 435 F.3d 800, 811 (7th Cir. 2006) (a finding that ignores significant portions of the evidence is not supported by the record). An applicant for asylum is entitled to a reasoned analysis, not one which

wholly disregards relevant, probative evidence. *See id.* at 813 (reversing and remanding where the immigration judge ignored relevant, probative evidence of political motivation)*; Mohideen v. Gonzales*, 416 F.3d 567, 571 (7th Cir. 2005) (reversing and remanding where the immigration judge ignored evidence regarding the "mixed motive" aspect of his claim); *Tolosa v. Ashcroft*, 384 F.3d 906, 909-10 (7th Cir. 2004) (reversing and remanding where the immigration judge ignored evidence that the applicant was persecuted based on ethnicity); *Yi-Tu Lian v. Ashcroft*, 379 F.3d 457, 461-62 (7th Cir. 2004) (reversing and remanding where the immigration judge ignored a long list of relevant evidence); *Niam v. Ashcroft,* 354 F.3d 652, 655, 658 (7th Cir. 2004) (reversing and remanding where the immigration judge ignored key evidence of persecution).

All we know of Spartak's fear of future persecution is that which is contained in the statement attached to his asylum application. (R. at 204-208). The order granting him asylum is a one page boilerplate form which contains no reasoning for the grant of asylum. (R. at 191). Despite this, there are a few things we can deduce about Spartak's fear of future persecution. To qualify for asylum, Spartak had to demonstrate either that he was persecuted in the past based on one of the enumerated classifications in the statute or, alternatively, that he had a well-founded fear of future persecution for the same reasons. *See* 8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1158(b)(1)(B)(i); *Balliu v. Ashcroft,* 467 F.3d 609, 612 (7th Cir. 2006). Past persecution alone rarely suffices for a grant of asylum. A refugee can qualify for asylum based on past persecution alone if the past persecution is particularly severe and heinous. *Balliu,* 467 F.3d at 612, 8 C.F.R. § 208.13(b)(1)(iii)(A); *Bucur v. INS*, 109 F.3d 399, 404-05 (7th Cir. 1997) (deducing that this exception is "designed for the case of the German Jews, the victims of the Chi-

nese 'Cultural Revolution,' survivors of the Cambodian genocide, and a few other such extreme cases."). We think it unlikely that Spartak's persecution falls within this very narrow exception. Consequently, we could venture a reasonable guess that, because Spartak obtained asylum, he must have demonstrated that he had a reasonable fear of future persecution. We need not, however, exercise our powers of deduction. Because the immigration judge wholly ignored the relevant and probative evidence on fear of future persecution, this case must be remanded for proper consideration of the evidence relating to Spartak's persecution and Ferdinant's fear of future persecution.[3]

Before we remand, however, we can resolve Ferdinant's due process claim that the immigration judge erred by failing to inform Ferdinant of his right to request withdrawal of his application for admission. Ferdinant asserts that the failure to inform him of that right pursuant to 8 C.F.R. § 1240.11(a)(2) and 8 U.S.C. § 1225(a)(4) violated his due process rights. The government argues that Ferdinant waived the argument by failing to raise it in his administrative appeal. Furthermore, the government argues, the claim lacks merit because the regulation that Ferdinant cites (8 C.F.R. § 1240.11(a)(2)) only requires immigration judges to inform an applicant of his eligibility for benefits enumerated "*in this chapter*" of the regulations. (Government Brief at 37) (citing 8 C.F.R. § 1240.11(a)(2)) (emphasis in original). According to the government, the "chapter" only refers to application for asylum, withholding of removal, cancellation of removal,

---

[3] The Department of Homeland security had an adequate opportunity to defend its position as to whether Spartak had a reasonable fear of future persecution and should now be precluded from relitigating this issue in Ferdinant's case. *See Hamdan v. Gonzales*, 425 F.3d 1051, 1059 (7th Cir. 2005).

adjustment of status, suspension of deportation, but not withdrawal of an application for admission. *Id.* (citing 8 C.F.R. § 140 et seq.) This is a puzzling argument, as the entirety of § 1235.4 of this same chapter—Chapter V, entitled "Executive Office for Immigration Review, Department of Justice"—specifically addresses withdrawal of applications for admission. 8 C.F.R. § 1235.4.

In any case, we need not resolve the issue of waiver or the reach of 8 C.F.R. § 1240.11(a)(2). Ferdinant's due process claim based on the immigration judge's failure to inform is reversible error only if he can demonstrate prejudice arising from it, and he has failed to do so. *Bejko v. Gonzlaes*, 468 F.3d 482, 487-88 (7th Cir. 2006) (citing *Ramos v. Gonzales*, 414 F.3d 800, 804 (7th Cir. 2005), *cert. denied* 126 S. Ct. 1331 (2006); *Feto v. Gonzales*, 433 F.3d 907, 912 (7th Cir. 2006)). Just like *Bejko*, Ferdinant was represented by counsel in the proceedings before the immigration judge, and does not allege that he was actually unaware of that right to withdraw his application for admission. *Id.* at 488. Moreover, just like *Bejko*, his only allegation of prejudice before this court is that had he been so informed, he "may have focused his endeavors on obtaining it." *Id.* Because he has not alleged that his actions would have been different or that he was unaware of the right, he has not demonstrated any prejudice that resulted from the immigration judge's alleged failure to inform him of his rights.

Ferdinant's brief on appeal contains a heading stating that "The Immigration Judge Erred in Determining That the Petition Did Not Meet His Burden for Asylum, Withholding of Removal and Protection Pursuant to the Torture Convention." (Mema Brief at 31), but the paragraphs below that heading fail to set forth any standards or arguments specific to his claims for relief based on the Convention Against Torture or for withholding of removal. Consequently, these undeveloped claims have been waived. *Balliu*, 467 F.3d at 614.

The petition for review is granted, the order of removal vacated, and the case remanded for further proceedings consistent with this opinion. Each party to bear its own costs.

A true Copy:

       Teste:

                          _____
                          *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*