NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 14, 2012
Decided May 9, 2013

**Before**

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 12-1425

| | |
|---|---|
| EDISON MANCELLARI,<br>*Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals. |
| *v.* | No. A098-399-422 |
| ERIC H. HOLDER, JR.,<br>Attorney General of the United States<br>*Respondent*. | |

**O R D E R**

Edison Mancellari, an Albanian citizen, petitions for review of an order of the Board of Immigration Appeals upholding the immigration judge's denial of his application for asylum and withholding of removal. He asserts that he will be persecuted if removed to Albania based on membership in a particular social group—his family, which he contends has been targeted by organized crime in Albania for shielding his sister from being trafficked as a prostitute. Because substantial evidence supports the Board's decision, we deny the petition for review.

In Albania, prostitution and human trafficking ruin many young girls' lives, and the Albanian government has taken efforts only recently to prosecute offenders and protect victims. Mancellari grew up hearing media reports of trafficking and was aware of several girls from his hometown who had been forced into prostitution. In 2003 he learned that his 13-year-old sister Anxhela was being courted by a notorious mafia boss, Feridon Babaj, more than 20 years her senior, who wanted to take her to Italy. Babaj was described in local news reports as being involved in child trafficking, prostitution, and other criminal activity. Because of Babaj's age and reputation, Mancellari feared that Anxhela was a target for trafficking and he convinced her not to contact Babaj anymore.

One day Babaj confronted Mancellari as he walked Anxhela to school. Babaj spoke angrily about Mancellari's interference in his relationship with her, and he suggested they meet alone later that evening to "have [a] longer conversation" about the matter. Feeling intimidated, Mancellari went home and told his parents about the encounter, and that night Mancellari and Anxhela moved in with their aunt and uncle, who lived 20 minutes away.

Mancellari's father reported Babaj to local police for threatening and harassing his son. The police arrested Babaj but released him the same day. That evening, Babaj showed up at Mancellari's house demanding $30,000 to cover his bail cost. He threatened to kill the Mancellari family if they did not meet his demands. Two months later, with the help of a family friend, Mancellari fled to Macedonia, then Spain, Venezuela, and Mexico, where he was smuggled across the border in Texas. Anxhela, meanwhile, stayed behind with her aunt and uncle.

After Mancellari's departure, his father sold their house to satisfy Babaj's $30,000 demand, but Babaj continued to seek information on Mancellari's whereabouts. Mancellari's father, mother, sister, and brother then moved to Greece, hoping to finally elude Babaj. Mancellari's uncle, who had remained in Albania, confronted Babaj and told him to leave the family alone. After this confrontation his uncle reported being followed regularly by a Mercedes-Benz bearing a license plate from Korce, Albania—Babaj's hometown and base of operations. A few months later, the uncle was gunned down while working on an assignment out of town in a secluded location. According to an unnamed eyewitness, the shooter had been inside the Mercedes. The eyewitness would not speak to police, however, so the death was labeled an automobile accident. The family wanted to identify bullet wounds in the body in order to challenge the automobile-accident report, but local burial customs prevented any postmortem analysis.

In mid-2005, Mancellari applied for asylum and withholding of removal, alleging persecution on account of his membership in a social group. In 2006 he married an Albanian woman from Korce (Babaj's hometown) who was a lawful permanent resident. In 2007 she

accompanied Mancellari at an immigration hearing, at which he testified about his troubles with Babaj back in Albania. Learning of this news for the first time, Mancellari's wife became distressed and told her family. Her father, who was also living in the United States at the time, convinced her to leave her marriage, and then took her back to Albania and arranged for her to abort the couple's unborn child. Word of Mancellari's testimony apparently reached Babaj, who in turn threatened Mancellari's parents (who had since returned to their hometown in Albania), telling them to warn their son not to testify about him anymore. Mancellari learned from his mother that Babaj somehow knew the date of his next hearing.

After evaluating this evidence, the IJ denied Mancellari's request for relief, concluding that he had failed to demonstrate past persecution or a well-founded fear of future persecution. Downplaying the seriousness of Babaj's threats, the IJ traced Mancellari's fear to a personal matter between his family and the mafia rather than any government action. The IJ opined that Albanian police likely opposed Babaj's criminal activities; he pointed to the 2008 State Department's Country Report, which described a "slow, steady decline in the number of persons trafficked each year" as evidence that the government was taking action to stop the practice, and observed that "Albanian police were willing to arrest [Babaj]." The IJ also determined without elaboration that Mancellari had not demonstrated persecution "on account of" any protected ground.

The Board of Immigration Appeals upheld the IJ's decision, finding that Mancellari's allegations of threats without physical harm did not amount to past persecution. Additionally, the Board concluded that Mancellari failed to show that membership in his proposed social group would be "one central reason" for any future persecution, because Babaj's extortion and threats toward his family were motivated by "personal animosity." The Board also noted that Mancellari's family still resides in their hometown and has not been harmed by Babaj. Finally, the Board agreed with the IJ's conclusion that Mancellari had not shown that the Albanian government was "unable or unwilling to control" Babaj. The Board, like the IJ, ruled that Mancellari's failure to establish a valid claim for asylum foreclosed the possibility of withholding of removal, which has a higher burden of proof.

Mancellari's primary argument on appeal is somewhat perplexing: he asserts that the IJ and Board erred in finding that his proposed social group was not cognizable. But neither the IJ nor the Board addressed the cognizability of Mancellari's proposed social group in their decisions. To the extent that cognizability were even at issue in this petition, that would typically be for the agency to decide in the first instance. *See Gonzales v. Thomas*, 547 U.S. 183, 184–86 (2006) (ruling that the agency must first determine "whether [petitioner's] family presents the kind of 'kinship ties' that constitute a 'particular social

group' "); *INS v. Orlando Ventura*, 537 U.S. 12, 16–18 (2002). But we need not reach the issue because Mancellari's asylum application falls short in other respects, as discussed below.

Mancellari also argues that the IJ and Board erred in finding that he did not establish past persecution. But as the Board stated, Mancellari was threatened but not physically harmed as a result of trying to protect his sister. Persecution involves "the use of *significant* physical force . . . , comparable physical harm without direct application of force . . . , or nonphysical harm of equal gravity." *Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011). Mancellari does not assert that he personally suffered physical harm, and the only nonphysical harm that he alleged was Babaj's implied threat during the confrontation near Anxhela's school. Threats alone, however, generally do not constitute persecution. *See Wang v. Gonzales*, 445 F.3d 993, 998 n.1 (7th Cir. 2006); *Hasanaj v. Ashcroft*, 385 F.3d 780, 782 (7th Cir. 2004); *Ahmed v. Ashcroft*, 348 F.3d 611, 616 (7th Cir. 2003); *see also Stanojkova*, 645 F.3d at 948 (noting that "a credible threat to inflict grave physical harm, as in pointing a gun at a person's head and pulling the trigger [although] unbeknownst to the victim the gun is not loaded," may suffice).

Finally, Mancellari argues that he established a well-founded fear of future persecution on account of his family membership, based on the severe actions taken toward his family members (including his uncle's assassination and the extortion of his father), and his deep concern that the Albanian government is unable or unwilling to disrupt Babaj's criminal activity. Mancellari maintains that his familial ties account for the brutal actions taken against his uncle and father, and potentially against him.

This argument faces several difficulties. The Board correctly concluded that his family's return to Albania, even to their hometown, undercuts his claim to have a well-founded fear of persecution based on family membership because the other members of his family have not suffered any threats or persecution. In response, Mancellari may be arguing a more nuanced point: namely, that particular members of his family—his father, his uncle, and himself—are being targeted because of their familial act of protecting the other family members. On this theory, the persecution is motivated by family relations rather than personal grudges. This presents a closer question, but it does not find support in our decisions about families as social groups. Indeed, "our asylum laws ordinarily do not extend protection to persons merely because a family member has suffered persecution." *Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007); *see also Mabasa v. Gonzales*, 455 F.3d 740, 746 (7th Cir. 2006). Instead, family relationships tend to play a role where "a persecutor attributes the political opinion of one or more family members to the asylum applicant" or targets the applicant as a means of "punishing or influencing" another family member. *Mema*, 474 F.3d at 416–17. But Mancellari's own testimony suggests that he is being targeted by Babaj irrespective of Babaj's actions toward the other family members. He testified that

his family members feared Babaj "because [Babaj] had all this hatred towards me, because . . . basically, in his mind, I was the one that ruined his future." Mancellari also testified that Babaj no longer blamed his sister but blamed Mancellari because "he lost a lot because of me." We conclude therefore that substantial evidence supports the Board's ruling that Babaj's threats against Mancellari were motivated by personal animosity because of Mancellari's interference in his affairs.

Ultimately, Mancellari's account describes family members protecting other family members from the lawless actions of a mafia boss, but it does not establish that family membership itself is the reason Mancellari fears future persecution; there are no opinions or motives being imputed to Mancellari's family members, nor does he allege that he fears being persecuted as a means of punishing some other member of his family. Accordingly, we **DENY** the petition for review.